BOARD OF EDUCATION OF THE CLEVELAND CITY SCHOOL DISTRICT, APPELLANT, *v.* GILLIGAN ET AL., APPELLEES.

(No. 72AP-307—Decided June 26, 1973.)

*Messrs. Kelley & McCann,* for appellant.
*Mr. William J. Brown,* Attorney General, and *Mr. Eric R. Gilbertson,* for appellees.

STRAUSBAUGH, J. This is an appeal from an order of the Court of Common Pleas of Franklin County overruling plaintiff's motion for summary judgment and sustaining defendants' motion for a summary judgment.

The plaintiff brought this action for injunctive relief and declaratory judgment against the governor of the state of Ohio and other officers, seeking to have the action of the defendants in reducing payments to the Cleveland city school district under the school foundation program by

three percent for the months of September and October of 1971 declared invalid and illegal.

The parties hereto stipulated in the trial court, among other things, that:

"6. Chapter 3317 of the Ohio Revised Code establishes the School Foundation Program under which the Plaintiff, Board of Education of the Cleveland City School District, has qualified for the disbursement of funds.

"7. Until December 20, 1971, the General Assembly of the State of Ohio had not enacted an appropriation measure for the full 1971-72 fiscal year but after July 1, 1971 had enacted a series of interim appropriation measures, each of which appropriated funds for various periods ranging from ten days to one month. Such interim appropriations measures provided funds for the financing of the School Foundation Program for the periods covered.

"8. House Bill 475, which made General Appropriations for the biennium beginning July 1, 1971 and ending June 30, 1973, and which provided for revenue for the state general revenue fund, included an appropriation sufficient to finance the School Foundation Program. This bill was passed December 20, 1971.

"9. Defendant Gilligan, purporting to act under the authority of Section 125.09 of the Revised Code, on August 18, 1971 ordered Defendant Hovey to direct a reduction in payments under the School Foundation Program by three percent (3%).

"10. Through the chain of command as set forth in the Defendants' affidavits, payments calculated as due to each school district in the State under the School Foundation Program were reduced by three percent (3%) for the months of September, 1971 and October, 1971. For the month of September, 1971, the reduction in payment to the Plaintiff was in the amount of $51,907.66. For the month of October, 1971, the reduction in payment to the Plaintiff was in the amount of $51,989.54.

"11. No further reductions have been made in payments under the School Foundation Program to the Plaintiff.

"12. The Defendants will continue to withhold the amounts by which the September, 1971 and October, 1971 School Foundation Program payments were reduced unless ordered by a court of competent jurisdiction to make said payments."

Plaintiff's first assignment of error is:

"The Trial Court erred when it concluded that Ohio Revised Code Section 125.09 is not an unconstitutional delegation of legislative authority.

"A. Ohio Revised Code Section 125.09 grants the Governor unlimited discretion in carrying out its mandate without providing any standards or criteria for his guidance."

R. C. 125.09 provides:

"On or before the tenth day of each month, the department of finance shall furnish to the governor statements in such form as he requires showing the condition of each fund and appropriation account to enable the governor to exercise and maintain effective supervision and control over the expenditures of the state.

"If the governor ascertains that the available revenue receipts and balances for the current fiscal year will in all probability be less than the appropriations for the year, he shall issue such orders to the respective departments, offices, and institutions as will prevent their expenditures and incurred obligations from exceeding the said revenue receipts and balances."

Plaintiff, the appellant herein, argues that this imperative command requiring the governor to issue orders after making certain determinations is given totally without any standards or rules for guidance in issuing such orders, and that where a legislative enactment does not contain sufficient criteria or standards to guide the administrative officer, the enactment is unconstitutional, as an invalid delegation of legislative authority. With this principle of law we cannot disagree. As the Supreme Court held, in the seventh paragraph of the syllabus of *Matz* v. *Curtis Cartage Co.* (1937), 132 Ohio St. 271:

"7. As a general rule a law which confers discretion

on an executive officer or board without establishing any standards for guidance is a delegation of legislative power and unconstitutional; but when the discretion to be exercised relates to a police regulation for the protection of the public morals, health, safety or general welfare, and it is impossible or impracticable to provide such standards, and to do so would defeat the legislative object sought to be accomplished, legislation conferring such discretion may be valid and constitutional without such restrictions and limitations."

This principle of law was approved and followed ten years later in the second paragraph of the syllabus of *Weber* v. *Board of Health* (1947), 148 Ohio St. 389, wherein the Supreme Court held:

"2. Where a law relates to a police regulation for the protection of public health, and it is impossible or impractical to provide specific standards, and to do so would defeat the legislative object sought to be accomplished, such law is valid and constitutional without providing such standards. * * *"

The standard set forth by the legislature here is the situation whereby the "Governor ascertains that the available revenue receipts and balances for the current fiscal year will in all probability be less than the appropriations for the year"; in other words, the state faces insolvency or bankruptcy. In such an event, the general welfare is most definitely affected. For the legislature to be required to provide specific standards to meet such an emergency would be impossible if not impracticable. Therefore, placing limited discretion upon the governor is necessary and understandable, for not only does insolvency or bankruptcy of the state affect the general welfare, but it also may endanger, as well, the public morals, health and safety. For the foregoing reasons, we find plaintiff's argument invalid that R. C. 125.09 does not fall within the limited exception to the constitutional rule requiring that standards for the guidance of administering officers be established.

Plaintiff argues next that "the defendants misapprehend the extent of power given the defendant Governor by Ohio Revised Code Section 125.09." Plaintiff maintains

that the power granted the governor under that section involves the exercise of great discretion and judgment which would allow him to eliminate a state program with which he was not in concurrence on policy grounds. From a practical standpoint, we cannot deny that this may be true. Under such an emergency situation, great dependence must be placed upon the integrity of the chief executive of the state to make intellectually honest decisions, with the hope that advantage not be taken of such emergency situation by the holder of such broad power. The first assignment of error is overruled.

Plaintiff's second assignment of error is:

"II. Even if power delegated to the Governor be characterized as 'ministerial', the orders issued by the Governor are invalid and illegal because he failed to comply with the terms of that delegation."

In other words, plaintiff argues that the Governor may not issue orders selectively or in a manner which would discriminate against any of the respective departments, offices or institutions of the state. Plaintiff cites the actions of the governor in ordering reductions of two dollars per patient per day in state payments to nursing homes for patients therein and the executive order of the governor closing the state parks. Although the Governor did not order a uniform cutback in state expenditures, there is no requirement, and could not feasibly be any requirement, forcing uniform cutbacks in all state expenditures because of the impossibility of foretelling what social and economic priorities may exist in the future. To require the legislature to lay down guidelines for the event of such an emergency would be to require the legislature to gaze into a crystal ball.

Plaintiff contends that it is doubtful if it was the intent of the legislature to give the governor a tool which could be used to bring political pressure to bear upon the General Assembly by making selective and discriminatory cuts in state programs to force the legislature into concurrence with the fiscal policies of the executive. We must agree that it is unlikely that such was the intent of the General Assembly. However, being unable to foresee what ser-

vices or programs in the future might hold the greatest priority, advance guidelines to determine priorities become a practical impossibility. The only safeguard of the public under such an emergency situation is the honesty and integrity of the governor acting with such unrestricted power. Abuse of such power, of course, has its remedy through the public acting as the electorate at the ballot box. The second assignment of error is overruled.

The third assignment of error is:

"III. The defendant Governor could not possibly have made the determination required by Ohio Revised Code Section 125.09 because prior to December 20, 1971, there was no appropriation bill containing the appropriations for the current year available."

At the time the reductions were ordered, no biennial budget had been passed or appeared forthcoming; therefore, at that time, from available information, a determination was made under R. C. 125.09 that "in all probability" available receipts and balances would be less than the current rate of expenditures in that fiscal year. Although subsequently a biennial revenue and appropriations bill was passed, at the time the determination was made, the determination was both reasonable and lawful. To hold that the powers of the Governor under R. C. 125.09 could not be invoked absent a final biennial budget would be to destroy the real purpose of that section. Plaintiff's third assignment of error is overruled.

Plaintiff's fourth assignment of error is:

"IV. Section 125.09 of the Ohio Revised Code is not applicable to payments made pursuant to Chapter 3317 of the Revised Code.

"A. Ohio Revised Code Section 125.09 is in clear and irreconcilable conflict with Chapter 3317 of the Ohio Revised Code.

"B. Ohio Revised Code Sections 3317.01 and 3317.02 were enacted subsequent to the enactment of Section 125.- 09 and therefore operate to repeal the latter by implication and to the extent of the repugnancy between the two.

"C. As special legislation, Sections 3317.01 and 3317.- 02 of the Ohio Revised Code must be read as exceptions to

general powers purportedly granted to the defendant Governor by Ohio Revised Code Section 125.09.''

Plaintiff contends that where two sections of the code contain inconsistent provisions relating to the same subject matter, the latter enactment must prevail and the earlier is repealed by implication. We find that, although this is true generally, it is so only when the two sections deal with the same specific subject matter and are so irreconcilably in conflict that both cannot govern.

The definition of ''departments, offices and institutions'' as contained in R. C. 125.09 is defined in R. C. 125.01 (B)(3) as follows:

''(3) 'Departments, offices, and institutions' include every organized body, office, and agency established by the constitution and laws of the state for the exercise of any function of the state government, and every institution or organization which receives any support from the state.''

We therefore find that plaintiff is included in the above definition and comes within the purview of R. C. 125.09.

A further examination of the language of the second paragraph of R. C. 125.09 reveals the use by the legislature of the words ''expenditures and incurred obligations.'' However, the language used in R. C. 3317.01 does not refer to ''expenditures'' or ''incurred obligations.'' Rather, the legislature uses the words ''appropriated,'' ''distributed'' and ''calculation of the amounts payable.'' R. C. 3317.01, in pertinent part, reads as follows:

''Chapter 3317. of the Revised Code shall be administered by the state board of education, with the approval of the controlling board. The superintendent of public instruction shall *calculate the amount payable* to each district and shall certify the amounts payable to each eligible district to the clerk of the district as provided for in chapter 3317. of the Revised Code.

''There shall be *appropriated* to the state board of education by the general assembly out of any moneys in the state treasury to the credit of the general revenue fund sufficient moneys to meet the financial obligations of Chapter 3317. of the Revised Code. * * *

''Moneys *distributed* pursuant to Chapter 3317. of the

Revised Code shall be *calculated* and paid on a fiscal year basis, beginning with the first day of July and extending through the thirtieth day of June. The moneys *appropriated* for each fiscal year shall be *distributed* monthly unless otherwise provided for.

"The amounts paid each month shall constitute, as nearly as possible, one-twelfth of the total amount payable for the entire year. Payments made during the six months of the fiscal year may be based on an estimate of the amounts payable for the entire year. Payments made in the last six months shall be based on the final *calculation of the amounts payable* to each school district for that fiscal year. * * *" (Emphasis added.)

Again, in R. C. 3317.02, the General Assembly uses the word "allocated" rather than "expended." Such section, in pertinent part, is as follows:

"Payments to school districts shall be as provided in this section and in sections 3317.04 and 3317.06 of the Revised Code.

"Out of the moneys appropriated by the general assembly for distribution pursuant to Chapter 3317. of the Revised Code for each fiscal year, each eligible school district shall be *allocated* the amount of money derived from the calculation in either division (A) or (B) following, whichever is greater, plus the amount in division (C) * * *." (Emphasis added.)

According to Webster's Third New International Dictionary, unabridged, the word "allocate" means the following:

"to apportion for a specific purpose or to particular persons or things * * * as * * * to give (a share of money, land, or responsibility) to a person * * * to distribute or to divide and distribute according to relative contribution to an objective whether on an equal, proportional, or judiciously calculated basis * * * to apportion and distribute (as costs and revenues) among accounts according to some predetermined ratio or agreed measure of involvement (as degree of responsibility or benefit received) * * * to deal out (something limited in supply) according to an al-

lowance schedule established esp. by a public authority or major producer * * * to set apart and earmark or designate: assign (materials or facilities for a project) * * *."

"Expend" is defined in Webster's, *supra*, as "to pay out or distribute * * * spend (the social services upon which public revenue is * * *) * * * to consume by use: use up * * * to spend money * * *."

"Obligate" is defined in Webster's *supra*, as follows: "to pledge as security * * * to assigne or commit (as funds) to meet a particular obligation (the treasury had *obligated* anticipated receipts from the new tax) * * * to constrain or bind to some course of action (as by legal measures, moral or social considerations, or force of circumstances) * * * oblige * * * to put under a promise, vow, or oath * * *."

It is clear that these words are not synonomous; they are not used interchangeably but each has a separate, distinct meaning. Had the legislature meant to include moneys "distributed" or "appropriated" or "calculated" the legislature would have included such words in R. C. 125.09 or defined the words "expenditures" and "incurred obligations" in R. C. 125.01(A). But it did not do so. Therefore, we can only assume the legislature did not intend to include those amounts calculated payable, those "moneys distributed" and "moneys appropriated" under R. C. 3317.01.

We find plaintiff's fourth assignment of error to be well taken and therefore sustained.

Plaintiff's fifth assignment of error is:

"V. Even if Ohio Revised Code Section 125.09 is constitutional and applies to School Foundation Program payments mandated by Ohio Revised Code Chapter 3317., the amount withheld should have been restored when the general assembly appropriated sufficient monies to fund the foundation program for the full biennium."

Inasmuch as we find that R. C. 125.09 does not apply to Chapter 3317, the amount withheld should have been restored.

The fifth assignment of error is sustained and the judgment is reversed and remanded.

*Judgment reversed & remanded.*

TROOP, P. J., concurs.
HOLMES, J., concurs separately.

HOLMES, J., concurring. I concur with the majority herein, but feel constrained to comment upon my reasons therefor which are based upon an interpretation of the Ohio constitutional mandates for the provision of public education in Ohio, and an interpretation of R. C. 3317, which provides for what is known as the school foundation program.

The Ohio Constitution cloaks the General Assembly with the responsibility for the control and financing of public education in Ohio.

Section 3, Article VI of the Ohio Constitution mandates that "provision shall be made by law for the organization, administration and control of the public school system of the state supported by public funds * * *." Also, Section 2, Article VI of the Ohio Constitution provides:

"The general assembly shall make such provisions, by taxation, or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the state * * *."

Historically, the state, through the General Assembly, has always assisted local school districts to some degree with their financing of education programs.

However, in 1935, Ohio enacted its first school foundation law, which inaugurated an extensive state participation in public school finance, a pattern and policy which has continued with ever increasing encompassment to the present.

The school foundation programs may be enacted as separate bills in the General Assembly or are, as in most recent sessions of the legislature, enacted within, and as a part of, the appropriations bill.

In effect, such school foundation programs establish a

financial partnership between the state government and the school districts. The basic premise of such enactments is to guarantee a minimum education program in every school district, and to assure a given measure of state financial assistance to all school districts in the state.

The school foundation program, and the method by which school district educational programs are funded, involves a very comprehensive formula as established by the legislature in order to meet the basic operational needs of a multistructured school system in Ohio, encompassing rural, as well as urban, school districts throughout the state.

Not only do the needs of the school system vary from biennium to biennium, but also the emphasis upon certain programs varies with the current trends of the times, and present a myriad of concerns for the General Assembly.

Such changing patterns of educational programs, and their attendant financing requirements and demands upon the general funds of this state, constantly bring new legislative challenges and debates in order to meet any such proven educational needs.

The legislature has, by virtue of R. C. Chapter 3317, given the charge and responsibilities to oversee and direct the School Foundation Program in Ohio to the state board of education. However, the legislature has provided by law that the administration of such school foundation program by the state board of education shall be subject to a financial check and balance by way of approval of any such administration by the controlling board of the state of Ohio.

R. C. 3317.01 provides, in pertinent part:

"There shall be appropriated to the state board of education by the general assembly out of any moneys in the state treasury to the credit of the general revenue fund sufficient moneys to meet the financial obligations of this chapter * * *."

R. C. 3317.02 provides, in pertinent part:

"Out of the moneys appropriated by the general assembly for distribution pursuant to Chapter 3317. of the Revised Code for each fiscal year, each eligible school dis-

trict shall be allocated the amount of money derived from the calculation * * *." [Thereafter follows the formula by which the school foundation funds are calculated.]

The language of these aforestated sections is specific that "There shall be appropriated to the state board of education by the general assembly * * * sufficient moneys to meet the financial obligations of this chapter [R. C. Chapter 3317] * * *."

Also, it is mandated that "Out of the moneys appropriated * * * each eligible school district shall be allocated the amount of money * * *" as calculated pursuant to the formula as provided by the legislature within the school foundation program legislation.

Nothing could be more clear than that such language mandates that the amounts as provided by the legislature, pursuant to the foundation formula as established by the legislature, and as subsequently calculated by the superintendent of public education, shall not only be allocated, but distributed to the eligible school districts under the detailed school foundation program.

True, there are other formula distributions of the general revenue fund in the state of Ohio, but there is no other comparable fund which has within it such an infinite degree of legislative attention, established upon a delicate balance of need, local versus state funding, size of district, teacher-pupil balance, geographic and population concerns, transportation needs, and a multitude of other considerations.

The legislative and public policy concerns that may reasonably be inherently aligned with the enactment of the school foundation bill, and its attendant funding, is unequaled in any other facet of state finance. Therefore, we believe that the sections of law within R. C. Chapter 3317 dealing with the appropriation of funds by the state legislature for school operating funds and the administration of the school programs and of such funds by the board of education to be a rather unique legislative area, and not really comparable to other circumstances of other departments, agencies, or boards which might be funded from formula allocations.

As stated, there is provided within the general Chapter 3317 an overview of the appropriations for school foundation purposes, and that is the provision that the administration of the school program of the state be carried on with the approval of the controlling board.

There were interim separate appropriation acts for the months of July through December, 1971, and each act contained provisions establishing a controlling board and setting forth its powers.

Such board is given authority to transfer funds within, but not between departments; to transfer items. of appropriation from one year to another; to transfer moneys in excess of need from rotary funds to the general fund; and to transfer moneys into new and existing funds.

However, even the controlling board had not, by the terms of such acts, been granted authority to cut back the level of support for state programs including education. The following language is to be found in the interim appropriation bill for August 1971: "The Board shall take no action which does not carry out the intent of the general assembly as to program goals and levels of support of state agencies."

The director of finance was given certain authority within the appropriation measure for August 1971, as well as those that followed, to transfer funds within departments and not to deviate more than 25 percent from the equal quarterly allotments to departments.

Again, however, the director is not given authority to curtail the level of support for state programs, as has been determined by the legislature.

There is no provision in any of the appropriation acts for the Governor to transfer, reallocate, or curtail funds to any department, agency or office. Further, we find no such authority within R. C. Chapter 3317.

It is our view that the payment level for appropriations to the school foundation program is by law to be calculated on the basis of the prescribed formula, and distributed to the school districts accordingly.

The matter before this court does not involve a situation in which an appropriation has been made to a given

department of state government which has not been calculated with the fixed and exacting detail as has this appropriated fund.

The important point is that appropriations to the school foundation program must be distributed in accordance with the specific mandates of R. C. Chapter 3317.

The defendants have asserted, and the court below has held, that R. C. 125.09 gives the Governor the power to issue orders which contradict the specific mandate of R. C. Chapter 3317. Thus, we feel that there is a clear and irreconcilable conflict between these statutes. In the face of such irreconcilable conflict one of the two statutory mandates must yield to the other. It is my view that the statutory mandates referring specifically to the school foundation program must be read so as to limit the power purportedly granted to the Governor by R. C. 125.09.

In the area of the fiscal policy of the state, R. C. 125.09 is a general statute which provides for the vesting of a general power within the Governor to issue orders to the various departments, state institutions, and offices to curtail expenditures and obligations. In contrast, R. C. 3317.-01 and R. C. 3317.02 very specifically deal with the funding of education under the formula of the school foundation program.

It is a well recognized principle of statutory construction that where there is a general statute and a special statute covering the same subject matter, the specific statute controls; see *State, ex rel. Bd. of Edn.,* v. *Shumann, Clerk* (1966), 7 Ohio St. 2d 41.

We believe R. C. 3317.01 and R. C. 3317.02 are specific statutes applying to the support of public education in Ohio, and that R. C. 125.09 is a general statute, and therefore the terms of the special statutes control the general statute.

Therefore, we must conclude that the governor has no authority pursuant to R. C. 125.09 to curtail or diminish payments made to school districts as calculated by the superintendent of schools pursuant to the school foundation program in force at the time.