STATE ex rel. AFSCME et al., Appellees,

v.

TAFT, Gov., et al., Appellants.

[Cite as *State ex rel. AFSCME v. Taft,* 156 Ohio App.3d 37, 2004-Ohio-493.]

Court of Appeals of Ohio,
Third District, Allen County.

No. 1–03–56.

Decided Feb. 9, 2004.

38

Jim Petro, Attorney General, Elizabeth T. Smith, Arthur J. Marziale Jr. and Randall W. Knutti Sr., Assistant Attorneys General, for appellants.

Andy Douglas and G. Gary Tyack, for appellees.

THOMAS F. BRYANT, Judge.

{¶ 1} Appellants, Governor Bob Taft, Director Reginald Wilkinson, and Warden Terry Tibbals, appeal from the order of the Court of Common Pleas of Allen County granting a declaratory judgment, writ of mandamus, and permanent injunction against the Governor and his subordinates, denying them the right to close Lima Correctional Institution, to transfer inmates out of the institution, and to proceed with layoff notices to employees of Lima Correctional Institution.

{¶ 2} In order to more completely and clearly understand the issues and arguments in this case, we begin with a brief history of the creation of Lima Correctional Institution ("LCI") and the changes it has undergone.

{¶ 3} On April 25, 1904, by Joint Resolution, the 76th General Assembly created a committee to "secure an option on land suitable for the hospital for the insane." On April 2, 1906, the 77th General Assembly appropriated $62,500 for the purchase of land for Lima State Hospital and provided for the "erection, organization and management" of the hospital. Lima State Hospital was com-

pleted in 1915 and was thereafter operated and maintained by appropriations of the General Assembly.

{¶ 4} In 1952, the Ascherman Unit (now the Oakwood Correctional Facility) was constructed on the northwest section of the hospital property. The Ascherman Unit was built as a 225–bed facility for sex offenders. As the needs of the Lima State Hospital decreased and the number of inmates sentenced to the Ohio Department of Rehabilitation and Correction ("ODRC") increased, the Ascherman Unit was acquired from the Ohio Department of Mental Health by ODRC as a "satellite" facility for the Marion Correctional Institution. On June 28, 1982, this satellite was chartered by ODRC as the Lima Correctional Facility and given its own appointing authority.

{¶ 5} Due to the unprecedented increase in the inmate population in the state of Ohio during the 1980s, state officials responded to the need for additional correctional facilities. Lima Correctional Institution was thereafter created pursuant to an Act of the 114th General Assembly, through Amended Substitute H.B. No. 530. The Act was signed by the Governor, and it directed and authorized the transfer of Lima State Hospital from the Ohio Department of Mental Health to ODRC. Further, H.B. No. 530 directed and authorized the renovation by the Ohio Building Authority of the existing former Lima State Hospital buildings to create a new medium-security 500–bed correctional institution. LCI has been funded and maintained by ODRC through appropriations from the General Assembly from the date of its creation up to, and including, the present.

{¶ 6} The present controversy began shortly after January 22, 2003, when Governor Taft issued Executive Order 2003–01T, in which he announced that he had "ascertained that the available revenue receipts and balances in the General Revenue Fund for the current fiscal year w[ould] in all probability be less than the General Revenue Fund appropriations for the fiscal year." The "current fiscal year" referred to in the Executive Order is fiscal year 2003, which ended June 30, 2003. The Governor further ordered "all state agencies, departments, offices, institutions, boards, and commissions of the executive branch which have General Revenue Fund appropriations, to reduce their expenses in the amounts and the manner determined by the Director of Budget and Management in order to prevent General Revenue Fund expenditures and incurred obligations from exceeding General Revenue Fund revenue receipts and balances for Fiscal Year 2003."

{¶ 7} The Deputy Director of Institutions at ODRC, Terry Collins, testified at the hearing for the preliminary injunction, on July 28, 2003, that budget restraints started back in December 2001 and eventually resulted in the closure of the Orient Correctional Institution. In addition, reductions in other operational

aspects of ODRC were considered and implemented. Housing units in several different prisons across the state have been closed as a result of the continuing struggle to meet budgetary demands over the past several years.

{¶ 8} Terry Collins testified further that the issuance of Executive Order 2003–01T required ODRC to determine how to make even more reductions in the cost of its operations, and that in pursuance of that goal, several meetings were held by the administrative departments at ODRC, including the Director, Assistant Director, Regional Directors, Fiscal Department, Division of Business Administration, and the Personnel Department. In light of Executive Order 2003–01T and in consideration of its appropriations for the fiscal years 2004 and 2005, Reginald A. Wilkinson, Director of ODRC, determined that closing LCI would help ODRC operate within its reduced budget for fiscal years 2003, 2004, and 2005. Based on this determination, Director Wilkinson recommended that LCI be closed.

{¶ 9} On January 28, 2003, Governor Taft and Director Wilkinson announced the closing of LCI, to be effective July 12, 2003. According to Terry Collins, LCI was chosen for closure by the Director because of such considerations as the age of the building, the security level of the prison, the location of other prisons to which inmates from LCI could be transferred, and because the prison was located in a complex with other state facilities. More specifically, ODRC chose LCI as the facility to close because the security level at LCI is Level 2 (medium security). Over the past year or so, ODRC had closed several units in other prisons across the state at Level 2 facilities, which made it more feasible to transfer inmates from LCI to units that would be reopened at Allen Correctional Institution, Southeastern Correctional Institution, and North Central Correctional Institution. At the time the decision was made to close LCI, the inmate population at the institution was 1,560. Therefore, approximately half of the inmate population at LCI could be moved to recently closed units at three other prisons.

{¶ 10} The Allen Correctional Institution and Oakwood Correctional Facility are operations of ODRC that will remain in the Lima, Ohio area. The continued operation of these facilities is expected to lessen the economic impact of the closure of LCI to the surrounding community. In addition, ODRC also provides funding for the Western Ohio Regional Treatment and Habilitation ("W.O.R.T.H.") Center, also located in Lima, Ohio. The Allen Correctional Institution is expected to assume the operation of the farm, garage, and warehouse currently on the LCI property. The Oakwood Correctional Facility is expected to assume the operation of the LCI powerhouse, which has supplied various services to the Oakwood Correctional Facility. There are no current plans for the transfer of the LCI property from the control of ODRC.

{¶ 11} Approximately half of the inmates housed at LCI have already been transferred to other facilities in the state of Ohio. ODRC began making arrangements to close LCI shortly after the decision was made to close it. The initial projected date of LCI's closure was July 12, 2003. However, the actions of ODRC were halted when the Ohio Civil Service Employees Association ("OCSEA") filed a complaint on April 14, 2003, in the Common Pleas Court of Allen County, challenging the decision of Director Wilkinson to close LCI. The motion for a temporary restraining order was granted by the trial court on April 16, 2003, after a hearing on the matter. The temporary restraining order was conditioned on the posting of a $50,000 surety bond or a $10,000 cash bond by the plaintiffs, OCSEA. The motion for a preliminary injunction was scheduled for hearing on April 30, 2003.

{¶ 12} On April 24, 2003, Director Wilkinson filed an action with the Ohio Supreme Court for a writ of prohibition to prevent the Common Pleas Court of Allen County from exercising further jurisdiction over the case initiated by OCSEA. Director Wilkinson also filed a motion requesting an emergency peremptory or alternative writ. Before the Ohio Supreme Court decided the case, OCSEA voluntarily dismissed the action in the Common Pleas Court of Allen County. On May 16, 2003, the Ohio Supreme Court granted a peremptory writ, effective immediately, on the grounds that the trial court "patently and unambiguously lack[ed] jurisdiction over the union's claims." *State ex rel. Wilkinson v. Reed,* 99 Ohio St.3d 106, 2003-Ohio-2506, 789 N.E.2d 203, at ¶ 30.[1]

{¶ 13} On May 23, 2003, OCSEA filed in the Common Pleas Court of Allen County a second action almost identical to the first. OCSEA asserted that the trial court had jurisdiction to enter an injunction to maintain the status quo at LCI during the arbitration period. After a hearing held on the same day, the trial court determined that it had jurisdiction in the case and granted a temporary injunction restraining the Director from closing or attempting to close LCI, from transferring inmates or equipment out of LCI, and from implementing a paper layoff of LCI employees. Thereafter, OCSEA voluntarily dismissed the case with prejudice pursuant to Civ.R. 41(A)(1) upon an agreement to maintain the status quo at LCI pending the outcome of the arbitration.

{¶ 14} The arbitrator entered a decision in the case on July 18, 2003, denying all of OCSEA's grievances and holding that the closing of LCI was not a matter for collective bargaining. On that same day, the American Federation of State, County and Municipal Employees ("AFSCME") and others filed an action in the Common Pleas Court of Allen County seeking a declaratory judgment, writ of mandamus, and permanent injunction against Governor Taft, Director Wilkinson,

---

1. But, see, 99 Ohio St.3d 106, 2003-Ohio-2506, 789 N.E.2d 203, at ¶ 31 (Pfeifer, J., dissenting).

and Warden Terry Tibbals to enjoin the closing of LCI. The court issued a temporary restraining order against the Governor and the other defendants on July 18, 2003.

{¶ 15} A preliminary injunction hearing was held on July 28, 2003, and on the same day the court issued an order setting bond in the amount of a $50,000 surety bond or a $5,000 cash bond. The order granting AFSCME a preliminary injunction pending a final adjudication of the case was issued on August 7, 2003. A final hearing on the merits for the permanent injunction was held on August 18, 2003.

{¶ 16} On August 21, 2003, the court issued its judgment declaring that the Governor and the Director of ODRC had violated the Separation of Powers, had usurped the legislative authority of the state of Ohio, had not acted in compliance with statutory law in ordering LCI to be closed, and were without lawful authority to close LCI and transfer inmates. Having so found, the trial court concluded that AFSCME and the other plaintiffs were entitled not only to a permanent injunction preventing the closing of LCI, the transfer of its inmates, and the layoff of LCI employees, but also a writ of mandamus requiring the Governor and Director to restore LCI to the status quo ante the Governor's budget order of January 22, 2003.

{¶ 17} On August 28, 2003, upon defendants' motion, the trial court granted a partial stay of its judgment, thereby maintaining the status quo at the institution pending appeal.

{¶ 18} This timely appeal from the judgment and orders of the trial court presents the following five assignments of error for our review:

"The trial court erred by finding that the Governor does not have the constitutional power to close LCI.

"The trial court erred in its interpretation and application of R.C. 126.05 and R.C. 5120.104, which also authorize the Governor's actions.

"The trial court erred by holding that the General Assembly specifically created LCI.

"The trial court erred in granting a writ of mandamus and curtailing the Governor's discretion.

"The trial court erred by denying and discharging a reasonable bond that will make the taxpayers of the state whole in the event that the state ultimately prevails."

{¶ 19} For purposes of economy and clarity, we have chosen to discuss the assignments of error in an order other than that presented by the parties in the briefs. In addition, we have chosen to address together some of the common points raised by the first four assignments of error, which, collectively, address

the premises underlying the trial court's declaratory judgment and for its granting extraordinary relief.

{¶ 20} Before we begin our analysis, however, we dispose of a procedural matter raised by AFSCME in its brief. AFSCME asserts that because the Governor and other defendants failed to file an answer in this case, they have admitted all of the material allegations in AFSCME's complaint. We note that an answer was not filed by defendants within 28 days of service of the complaint, as required by Civ.R. 12(A). AFSCME argues that Civ.R. 8(B) also requires a party to state defenses to each claim asserted and to admit or deny the averments upon which the adverse party relies. We also note that AFSCME, the plaintiffs below, sought neither a default judgment nor a ruling deeming the allegations of the complaint to be admitted.

{¶ 21} The timing of events below is relevant. AFSCME filed its complaint on July 18, 2003. The hearing for the preliminary injunction was held ten days later on July 28, 2003, before the date in which an answer was required to be filed. AFSCME has admitted that prior to the hearing on the preliminary injunction, counsel for the defendants provided it with a document entitled "Memorandum in Opposition to Motion for Preliminary Injunction" presenting an affirmative defense.

{¶ 22} The trial court proceeded to trial on the merits before the time elapsed within which defendants were required by the Civil Rules to file an answer. The court did not accelerate the filing deadlines, but afforded a hearing on all issues raised by the parties at the hearings. Since a full hearing was held for the preliminary injunction and the parties proceeded as if by consent, we are convinced that AFSCME was fully advised in advance of the defendants' defenses to the asserted claims. Since the matter was not presented to the trial court before judgment, to the extent it has not been waived, it has not been preserved for appeal.

{¶ 23} We begin analysis of the assignments of error with the fifth assignment of error, which involves the trial court's denial and discharge of the bond. Bond was posted by the plaintiffs in the trial court pending a hearing and ruling with regard to the motion for a permanent injunction. Bond was discharged by the trial court when the permanent injunction was issued on August 21, 2003, because the plaintiffs had prevailed.

{¶ 24} On this appeal, any bond to be set would be required of the appellants. However, since the defendants below are now appellants and because the government need not post bond, pursuant to Civ.R. 65(C), the plaintiffs' bond below was properly discharged by the trial court. Since no party has sought a

bond or would be required to post a bond in this proceeding, the issue is moot. Therefore, we overrule the fifth assignment of error.

{¶ 25} We note that in addressing the remaining assignments of error, we necessarily are reviewing the trial court's orders granting declaratory relief, the predicate for its granting a permanent injunction and a writ of mandamus.

{¶ 26} A declaratory judgment action allows a court of record to declare the rights, status, and other legal relations of the parties whether or not any further relief is or could be claimed. Civ.R. 57 and R.C. 2721.01 et seq. "The declaration may be either affirmative or negative in form and effect." R.C. 2721.02. If a trial court errs in the use of its power in deciding declaratory judgment action and issuing injunctions, there is an adequate remedy by appeal. *State ex rel. Erie Cty. Democratic Executive Commt. v. Brown* (1966), 6 Ohio St.2d 136, 35 O.O.2d 154, 216 N.E.2d 369. Courts may refrain from entertaining an action for declaratory judgment that depends largely on a determination of facts. *Smith v. Mun. Civ. Serv. Comm.* (1952), 158 Ohio St. 401, 49 O.O. 277, 109 N.E.2d 507. Therefore, declaratory judgment actions usually involve cases with little or no disagreement with regard to the facts of the case and require only a determination by the court of questions of law.

{¶ 27} The case sub judice is one of these cases, requiring a determination of questions of law, rather than questions of fact. We review questions of law de novo, which requires an independent review of the trial court's decision without any deference to the trial court's determination. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153. We independently review the declaratory judgment granted by the trial court in this case as a matter of law to determine whether the correct declaration of law was made.

{¶ 28} In its order granting declaratory judgment, as well as granting a permanent injunction and writ of mandamus, the trial court erred in making the following findings and orders:

"86. The Court hereby declares that Governor Robert A. Taft and Reginald A. Wilkinson, Director of ODRC have violated the Separation of Powers as established by the Ohio Constitution and laws passed by the Ohio General Assembly.

"87. That as a result, Governor Robert A. Taft and Reginald A. Wilkinson were without lawful authority to close LCI and transfer inmates under the conditions stated.

"88. The Plaintiffs have proven by clear and convincing evidence that the legislative authority of the State of Ohio has been usurped entitling them to a permanent injunction since there is no adequate remedy at law and that severe,

permanent and irreparable harm will result from the Governor's illegal directive and order.

"89. That the Governor/Director has a clear legal duty to act in compliance with the laws the legislature has enacted; that Plaintiffs and the citizens of the State of Ohio have a clear legal right to the relief prayed for; Relators have no plain and adequate remedy at law and that a Writ of Mandamus is appropriate.

"90. That as a result of the above, a Permanent Injunction is hereby issued against Governor Robert A. Taft, Director Reginald A. Wilkinson and Warden Terry Tibbals from transferring inmates out of LCI; from closing LCI; and to cease from proceeding with lay-off notices as to employees of LCI.

"91. That a Writ of Mandamus is hereby issued directing and compelling the above named Defendants to comply with their clear legal duty as set forth by the General Assembly and to take whatever steps necessary to re-instate the status quo operation as it existed at LCI immediately prior to the Governor's directive of January 22, 2003 and that he allocate sufficient funds to accomplish same." August 21, 2003 Order for Declaratory Judgment, at 17–18.

{¶ 29} Resolution of the legal issues presented in this case requires interpretation of the Ohio Constitution and the laws granting authority to the Governor and his subordinates. The Constitution and statutes are clear and need no construction or interpretation beyond their plain meaning. Creation of LCI was authorized by a legislative act, the purpose of which was accomplished by the erection and completion of the correctional facility and assignment of its operation to ODRC. Since the trial court's initial premise upon which plaintiffs' rights were founded is determined by this court to be a false premise, all relief granted by the trial court based upon these erroneous findings is error. The trial court has no discretion to disregard the law or to fashion relief where there is no right impinged or duty violated. The proper declaration of law is that the Director and the Governor have the authority to transfer prisoners from LCI, lay off LCI employees, and close the operations of LCI. Thus, there is no basis remaining for the issuance of any extraordinary writ, whether an injunction or mandamus. Therefore, the trial court has abused its discretion as a matter of law by granting relief where it had no jurisdiction to act.

{¶ 30} We have elected to address the first, second, and third assignments of error together as they relate to the declarations made by the trial court. In the third assignment of error, AFSCME asserts that the trial court erred by holding that the General Assembly specifically created LCI. AFSCME argues that H.B. No. 530, an Act, is the law of the state of Ohio unless repealed by the General Assembly. Expanding on that proposition of law, AFSCME argues that since H.B. No. 530 provided for the construction of a 500–bed correctional facility, known as LCI, such facility cannot be closed unless and until the General

Assembly provides for its closure by a legislative act. The trial court accepted this proposition in concluding that the Governor and Director violated the separation-of-powers doctrine.

{¶ 31} The United States Constitution does not impose the doctrine of separation of powers on the states. *State ex rel. Plain Dealer Publishing Co. v. Cleveland* (1996), 75 Ohio St.3d 31, 661 N.E.2d 187; *Mayor of Philadelphia v. Educational Equality League* (1974), 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630. Likewise, Ohio does not have a constitutional provision expressly stating the concept of the separation of powers. *S. Euclid v. Jemison* (1986), 28 Ohio St.3d 157, 28 OBR 250, 503 N.E.2d 136. However, "this doctrine is implicitly embedded in the entire framework of those sections of the Ohio Constitution that define the substance and scope of powers granted to the three branches of state government." Id. at 159, 28 OBR 250, 503 N.E.2d 136. The separation-of-powers doctrine is applied only when there is some interference by one governmental branch with the constitutional authority of another governmental branch. Pursuant to this doctrine, "each of the three grand divisions of the government must be protected from the encroachments by the others, so far that its integrity and independence may be preserved." Id., citing *Fairview v. Giffee* (1905), 73 Ohio St. 183, 187, 76 N.E. 865.

{¶ 32} AFSCME claims that Governor Taft and Director Wilkinson have usurped the power of the legislature by closing a prison created by the legislature, concluding that because the legislature created LCI, only the legislature could close it. The legislation claimed to have created LCI is H.B. No. 530.

{¶ 33} H.B. No. 530 provides for the construction and renovation of numerous state correctional institutions. Pertaining specifically to LCI, H.B. No. 530 directs the Ohio Building Authority to construct a 500–bed correctional facility at the former location of Lima State Hospital. H.B. No. 530 further transfers control of the land where LCI was constructed to ODRC from the Department of Mental Health, and requires ODRC to give certain preferences for employment at LCI to former employees of Lima State Hospital. H.B. No. 530 does not by its terms or effect command the continued operation of LCI.

{¶ 34} What is clear from the plain and unambiguous language of H.B. No. 530 is that LCI was to be under the authority of the Director of ODRC. While the General Assembly appropriates funds to ODRC to operate the numerous correctional facilities in the state, ODRC allocates the funds among the facilities within its discretion. LCI has always been funded, operated, and maintained from funds generally appropriated to ODRC. Since its construction in 1984, LCI has been operated under the direction of ODRC, and it cannot be viewed as an entity existing separately and independently of ODRC.

{¶ 35} ODRC is an administrative department of the state, pursuant to R.C. 121.02(P). That provision also provides that the Department of Rehabilitation and Correction "shall be administered by the director of rehabilitation and correction." Id. Pursuant to R.C. 121.03(Q), the Director of ODRC is "appointed by the governor, with the advice and consent of the senate, and shall hold [his] office[ ] during the term of the appointing governor, and [is] subject to removal at the pleasure of the governor."

{¶ 36} It is beyond doubt that a director of an executive agency possesses executive power. A director may exercise some executive power at the direction of the Governor. "The governor is the supreme executive of the state, and a responsibility delegated to an executive agency is essentially delegated to the governor's subordinate." *State ex rel. Ohio Roundtable v. Taft*, 10th Dist. No. 02AP–911, 2003-Ohio-3340, 2003 WL 21470307, at ¶ 25. However, a director may also exercise executive power through authority delegated by the General Assembly. *State ex rel. Junk v. Herrick* (1923), 107 Ohio St. 611, 621, 140 N.E. 314. R.C. Chapter 5120 appears to grant broad executive powers to the Director of ODRC.

{¶ 37} While the defendants have relied on R.C. 5120.104(C) as authorizing Director Wilkinson's action of closing LCI, that section gives authority to the director only to operate and make any other agreement with respect to the operation of halfway houses. The definition of a halfway house, contained in R.C. 5120.102(E), clearly does not include LCI. Therefore, this provision provides no guidance in addressing the claims presented in this case other than that it follows the same procedure used in the other statutory provisions giving the director control of the facilities within the department and discretion in his supervision of the department.

{¶ 38} Other sections of R.C. Chapter 5120 are more relevant to our review of the issues in this case. The Director of ODRC is given the authority, under R.C. 5120.01, to issue orders controlling the institutions that ODRC operates. R.C. 5120.01 also gives the director the power to control the transfer of inmates between state institutions under R.C. 5120.05. Pursuant to R.C. 5120.05, ODRC "may maintain, operate, manage, and govern all state institutions for the custody, control, training and rehabilitation of persons convicted of crime and sentenced to correctional institutions."

{¶ 39} In relation to the authority granted to the Director of ODRC in R.C. 5120.01, R.C. 5120.03(A) provides the director with the authority to change the use of institutions:

"The director of rehabilitation and correction, by executive order and with the approval of the governor, may change the purpose for which any institution or

place under the control of the department of rehabilitation and correction, is being used. The director may designate a new or another use for such institution, if the change of use and new designation has for its objective, improvement in the classification, segregation, care, education, cure, or rehabilitation of persons subject to the control of the department." R.C. 5120.03(A).

{¶ 40} Putting aside, for now, the issue regarding the scope of the Governor's authority, R.C. 5120.03(A) confers broad authority on the Director of ODRC that we believe, in the circumstances in this case, has authorized Director Wilkinson to order the closing of LCI. The closing of a correctional institution is a matter that certainly affects the "use" of the facility.

{¶ 41} Director Wilkinson decided to change the use of LCI by transferring the inmates housed there to other correctional facilities within the state and terminating the existing employment positions at LCI. The operations of the powerhouse will continue on the LCI property and will be maintained by the Oakwood Correctional Facility. In addition, the operations of the farm, warehouse, and garage will also continue on the LCI property and will be maintained by Allen Correctional Institution. Further, employment positions will be created at the Oakwood and Allen facilities to attend to these remaining operational needs.

{¶ 42} Director Wilkinson determined that the inmates confined at LCI could be confined at other correctional institutions in the state in order to meet the budgetary constraints placed on ODRC. The Director of ODRC is vested with the authority to make the decision that the use for which LCI is used shall change due to the fact that the inmates housed at LCI will be better cared for in other institutions in the state considering the reduction in funds appropriated to ODRC. The director may determine that increasing the number of inmates and corrections officers at a smaller number of correctional facilities will provide better care than decreasing the number of corrections officers at a larger number of correctional facilities.

{¶ 43} Even if it could be determined that R.C. 5120.03(A) does not clearly authorize the actions of the director, R.C. 5120.36 should resolve any doubt in that regard. R.C. 5120.36 provides:

"The department of rehabilitation and correction, in addition to the powers expressly conferred, shall have all power and authority necessary for the full and efficient exercise of the executive, administrative, and fiscal supervision over the state institutions described in section 5120.05 of the Revised Code."

{¶ 44} R.C. 5120.36 clearly confers upon the Director of ODRC the power and authority to make decisions relating to the exercise of fiscal supervision, among other areas, over all the state correctional facilities. In making these decisions, the director takes into consideration the operations of ODRC in the entire state.

This case involves the authority and power of the Director of ODRC in his supervision of the operations of the entire department in the state of Ohio. The budget of ODRC and the executive orders by the Governor to reduce expenses of ODRC are factors that affect the operations of ODRC on a statewide level. While the instant case involves only the facility of LCI, the issues in this case involve the authority of the Director of ODRC to maintain the operations of ODRC in the entire state on a reduced budget. As R.C. 5120.36 provides, Director Wilkinson is given broad authority and discretion in operating the entire ODRC.

{¶ 45} We conclude that there is no constitutional or legislative impediment preventing Director Wilkinson of ODRC from determining that the obligations of his office in meeting the budgetary constraints were best met by closing LCI and transferring the inmates to other correctional institutions in the state. While the Governor concurred in the considered decision of Director Wilkinson and made an announcement regarding the closing of LCI, the decision was ultimately made by Director Wilkinson, where such authority clearly lay.

{¶ 46} We now turn to the issue regarding the Governor's authority to implement the decision of Director Wilkinson to close LCI. The first assignment of error addresses the authority granted to the Governor by the Ohio Constitution; whereas the second assignment of error addresses the Governor's statutory authority pursuant to R.C. 126.05 and R.C. 5120.104.

{¶ 47} The constitutional legislative power of the state is vested in the General Assembly, pursuant to Section 1, Article II, Ohio Constitution. The executive department of the state consists of the Governor, Lieutenant Governor, Secretary of State, Auditor of State, Treasurer of State, and the Attorney General. Section 1, Article III, Ohio Constitution. The supreme executive power of the state is vested in the Governor. Section 5, Article III, Ohio Constitution. The legislature cannot take away from the Governor any of the powers and duties that are conferred upon him by the Constitution. *State ex rel. S. Monroe & Son Co. v. Baker* (1925), 112 Ohio St. 356, 147 N.E. 501. The General Assembly does have the ability to grant additional power to the Governor by virtue of a statute. *State ex rel. A. Bentley & Sons Co. v. Pierce* (1917), 96 Ohio St. 44, 117 N.E. 6. Such grant of power may be express or implied. Id. Therefore, an act by the Governor within his constitutional or statutory authority will not breach the doctrine of the separation of powers unless such act is truly beyond the Governor's authority and encroaches on the authority of the legislature or of the courts.

{¶ 48} The Governor's authority under Section 5, Article III of the Ohio Constitution, in light of his statutory authority over the state budget, permits the Governor to implement the recommendation or decision of the director of a state

agency to close a state facility. Section 5, Article III of the Ohio Constitution vests in the Governor broad executive authority over actions of state agencies, including the authority to see to it that the decision of the director of a state agency ordering the closing of a state correctional facility is carried through.

{¶ 49} Although the phrase "executive power" has not been specifically defined, it appears to be firmly established in Ohio law that the Governor not only has the powers necessary to perform the duties specifically required of him by the Constitution and statutes, but he is also empowered to act in the interest of the state and in ways not specified, so long as his actions do not contravene the Constitution or violate laws passed by the legislature within its constitutional authority. *Monroe*, 112 Ohio St. at 371, 147 N.E. 501.

{¶ 50} While we do not find R.C. 5120.104 particularly helpful in determining the authority of the Governor, we do find R.C. 126.05 relevant to our discussion, as R.C. 126.05 gives the Governor the authority to issue executive orders in regard to the state budget. R.C. 126.05 provides:

"If the governor ascertains that the available revenue receipts and balances for the general revenue fund for the current fiscal year will in all probability be less than the appropriations for the year, he shall issue such orders to the state agencies as will prevent their expenditures and incurred obligations from exceeding such revenue receipts and balances."

{¶ 51} Governor Taft issued Executive Order 2003–01T on January 22, 2003, pursuant to his authority under R.C. 126.05. Based on the reports from the Director of Budget and Management, the Governor ascertained that the available revenue receipts and balances in the General Revenue Fund for the fiscal year would likely be less than the appropriations for the fiscal year. Executive Order 2003–01T ordered the reduction only of expenses "in the amounts and the manner determined by the Director of Budget and Management" in order to prevent expenditures from exceeding receipts and balances in the General Revenue Fund.

{¶ 52} The inference to be taken from the order is that the directors of all state agencies, departments, offices, etc. were given the discretion to determine how such reductions would be dealt with in each particular agency, department, office, etc. The Director of ODRC determined that the agency would best meet the reduction mandate by closing an expensive correctional institution and transferring the inmates to existing institutions where they could be absorbed at a minimal cost. This was the solution that Director Wilkinson conveyed to Governor Taft, and it was determined that the closure would be effective July 12, 2003. As we earlier determined, Director Wilkinson has the authority to make the decision to close LCI, by virtue of his powers in R.C. 5120.03(A) and 5120.36. In addition, Governor Taft has the authority, as chief executive officer of the state, to institute the lawful recommendations and decisions of the directors of state agencies.

{¶ 53} Having determined that the Director of ODRC is authorized by statute to close LCI, neither his action nor the authorized executive order by the Governor from which that decision resulted present a separation-of-powers violation vis-à-vis the legislative power of the General Assembly. Therefore, the first, second, and third assignments of error are sustained.

{¶ 54} The fourth assignment of error presented for our review asserts that the trial court erred in granting a writ of mandamus and curtailing the Governor's discretion. Having found merit with the first, second, and third assignments of error, we conclude, as previously stated, that the findings underlying the declaratory judgment granted by the trial court are erroneous. Therefore, the injunction and mandamus granted by the trial court based on these erroneous findings cannot stand.

{¶ 55} An injunction is an extraordinary remedy in equity that is reserved for use by the trial court when there is no adequate remedy at law. *State ex rel. Pressley v. Indus. Comm.* (1967), 11 Ohio St.2d 141, 40 O.O.2d 141, 228 N.E.2d 631. The grant or denial of an injunction is held to be within the sole discretion of the trial court, and a reviewing court should refrain from disturbing the judgment of the trial court unless there is a showing of abuse of discretion. *Perkins v. Quaker City* (1956), 165 Ohio St. 120, 125, 59 O.O. 151, 133 N.E.2d 595. A trial court abuses its discretion when the result is "so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias." *Nakoff v. Fairview Gen. Hosp.* (1996), 75 Ohio St.3d 254, 256, 662 N.E.2d 1. In addition, "trial courts should be cautious in granting injunctions, 'especially in cases affecting a public interest where the court is asked to interfere with or * * * to control the action of another department of government.'" *Ottawa Cty. Bd. of Commrs. v. Marble-head* (1995), 102 Ohio App.3d 306, 315–316, 657 N.E.2d 287, citing *Country Club Hills Homeowners Assn. v. Jefferson Metro. Hous. Auth.* (1981), 5 Ohio App.3d 77, 5 OBR 189, 449 N.E.2d 460, paragraph three of the syllabus.

{¶ 56} The trial court in this case made findings in its order granting a permanent injunction that were based on its erroneous interpretations of several statutory provisions. Further compounding its error, the trial court ignored statutory provisions that clearly granted broad authority to ODRC to make decisions that encompassed the closing of a correctional facility. Instead, the trial court focused its considerations and findings largely on the wisdom and the social and economic effects of closing LCI rather than the constitutional and statutory authority of the Governor and his department directors to make those executive decisions. Further, the trial court involved itself in the process of

determining the pertinence and weight of the factors to be considered when deciding whether or not to close a correctional facility. This, of course, is an encroachment by the judiciary on the prerogative of the executive branch to exercise its sole discretion in such matters. It was, therefore, an abuse of discretion for the trial court to issue an injunction when it had no jurisdiction to compel the Governor to exercise his executive discretion in any certain way or to prevent him and his department heads from fully exercising the constitutionally and statutorily granted prerogatives of their offices.

{¶ 57} Similarly, it is a general rule that when granting a writ of mandamus, no court has jurisdiction to compel the performance of an executive act of the Governor that is dependent upon the judgment or discretion of the Governor. *State ex rel. Watkins v. Donahey* (1924), 110 Ohio St. 494, 500, 144 N.E. 125. Such an act of discretion by the Governor will be subject to judicial control only when there has been a clear abuse of discretion. *State ex rel. Armstrong v. Davey* (1935), 130 Ohio St. 160, 163, 4 O.O. 38, 198 N.E. 180. An abuse of discretion is established where the Governor has neglected or refused to act to exercise discretion when duty requires it. *State ex rel. Gilligan v. Hoddinott* (1973), 36 Ohio St.2d 127, 65 O.O.2d 310, 304 N.E.2d 382. Only the ministerial duties of the Governor may be subject to control by mandamus proceedings in appropriate circumstances. *Watkins,* 110 Ohio St. at 500, 144 N.E. 125.

{¶ 58} A relator in a mandamus action must establish that (1) the relator possesses a clear legal right to the relief he seeks; (2) the respondent possesses a clear legal duty to perform the requested act; and (3) the relator possesses no plain and adequate remedy in the ordinary course of the law. *State ex rel. Manson v. Morris* (1993), 66 Ohio St.3d 440, 441, 613 N.E.2d 232, citing *State ex rel. Berger v. McMonagle* (1983), 6 Ohio St.3d 28, 29, 6 OBR 50, 451 N.E.2d 225.

{¶ 59} AFSCME has failed to establish the requirements for a writ of mandamus. An executive decision on the allocation of funds or budget cuts is an act that is discretionary in nature. *Cleveland City School Dist. Bd. of Edn. v. Gilligan* (1973), 36 Ohio App.2d 15, 65 O.O.2d 9, 301 N.E.2d 911, affirmed on other grounds (1974), 38 Ohio St.2d 107, 67 O.O.2d 108, 311 N.E.2d 529. Therefore, mandamus will not lie in a case where the Governor makes an executive decision to reduce the allocation of funds to state departments, agencies, offices, etc. in order to keep the state budget balanced, unless it could be found that the Governor clearly abused his discretion by neglecting or refusing to take any action to do so. As our discussion herein has revealed, AFSCME has no legal right to have the Governor or his subordinates restore operations at LCI as they existed before the decision to close LCI was made, nor are the Governor and his subordinates under a duty to resume or continue the operation of LCI in any manner. As there is no right or duty to be enforced, no remedy at law or otherwise is required, and none may be compelled by mandamus.

{¶ 60} The declaration that should have been made by the trial court is that the Governor and Director have the authority to transfer prisoners from LCI, lay off LCI employees, and close the operations of LCI. Therefore, we conclude that the trial court abused its discretion by acting beyond its authority to do so when it issued a permanent injunction and writ of mandamus enjoining the Governor, Director, and Warden from closing LCI, transferring prisoners out of LCI, and preventing them from sending layoff notices to LCI employees and by directing and compelling the parties to take steps to reinstate the operation of LCI as it existed prior to the Governor's directive of January 22, 2003. Therefore, we sustain the fourth assignment of error.

{¶ 61} In accordance with the foregoing, the judgment of the Common Pleas Court of Allen County is reversed, the orders and writs entered by that court herein are vacated, and pursuant to App.R. 12(B), judgment is entered declaring that in ordering the closing of LCI, the transferring of prisoners to other institutions and the paper layoff of employees, the defendants-appellants have acted within their constitutional and statutory authority. In all other respects, plaintiffs-appellees' complaint is hereby dismissed.

Judgment reversed.<br>Order to vacate.

FAIN and GRADY, JJ., concur.

MIKE FAIN and THOMAS J. GRADY, JJ., of the Second Appellate District, sitting by assignment in the Third Appellate District.