[Cite as *O'Neal v. State*, 2020-Ohio-506.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| James D. O'Neal et al., | : | |
| Plaintiffs-Appellants, | : | No. 19AP-260 |
| | | and |
| v. | : | No. 19AP-289 |
| | | (C.P.C. No. 18CV-758) |
| State of Ohio et al., | : | |
| | | (REGULAR CALENDAR) |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on February 13, 2020

**On brief:** *Law Office of S. Adele Shank*, *S. Adele Shank*; and *Lawrence J. Greger*, for appellant James D. O'Neal. **Argued:** *S. Adele Shank*.

**On brief:** *Timothy Young*, Ohio Public Defender, *Richard A. Cline* and *Randall Porter*; *Jon M. Sands*, Federal Public Defender for the District of Arizona, and *Dale A. Baich*, for appellant Cleveland Jackson.

**On brief:** *Dave Yost*, Attorney General, *Charles A. Schneider*, and *Brenda S. Leikala*, for appellees. **Argued:** *Brenda S. Leikala*.

APPEALS from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Plaintiffs-appellants, James D. O'Neal and Cleveland Jackson, appeal from the judgment of the Franklin County Court of Common Pleas denying their motions for summary judgment and granting the motion for summary judgment filed by defendants-appellees, State of Ohio and the Ohio Department of Rehabilitation and Correction ("ODRC"). Because the parties agree that there are no disputed factual issues and because appellees are entitled to judgment as a matter of law, we affirm.

{¶ 2} Since 1994, ODRC has maintained an execution protocol setting forth comprehensive and detailed procedures to be utilized in carrying out court-ordered executions in Ohio. Over the years, ODRC has revised the execution protocol numerous times, with each subsequent protocol superseding the previous one. The twentieth and most recent version, designated 01-COM-11, became effective on October 7, 2016 and remains in use and effect. Each version of the execution protocol, including the present version, have been promulgated by ODRC as policies, not administrative rules.

{¶ 3} Appellants are inmates in ODRC custody who have been sentenced to death for their crimes. On January 24, 2018, O'Neal filed a complaint seeking declaratory and injunctive relief "to determine and enforce [his] right * * * not to be subjected to the execution procedures" set forth in 01-COM-11. (Jan. 24, 2018 Compl. at 1-2.)[1] O'Neal sought declarations that (1) ODRC failed to comply with the filing requirements of R.C. 111.15 in promulgating 01-COM-11, thus rendering 01-COM-11 invalid and unenforceable; (2) in enacting 01-COM-11, ODRC exceeded the scope of the authority delegated by the General Assembly and thus unconstitutionally usurped legislative powers; and (3) to the extent the General Assembly delegated such powers to ODRC, such action was an unconstitutional delegation of legislative authority. O'Neal maintained that because ODRC lacked the necessary grant of authority to promulgate an execution protocol, ODRC should be permanently enjoined from enacting execution protocols in the future. In the alternative, O'Neal maintained that if ODRC had the authority to promulgate an execution protocol, ODRC should be enjoined from carrying out his execution because the protocol was invalidly promulgated. Jackson later filed a motion to intervene and filed a complaint nearly identical to that filed by O'Neal.[2]

{¶ 4} On January 25, 2019, all parties filed motions for summary judgment. By opinion and judgment entry filed on April 4, 2019, the trial court denied appellants' motions for summary judgment and granted appellees' motion for summary judgment.

---

[1] Condemned inmate Raymond Tibbetts was also a named plaintiff in the complaint. By entry filed July 25, 2018, Tibbetts was permitted to withdraw pursuant to then-Governor Kasich's commutation of his death sentence. By entry of May 30, 2018, condemned inmate Robert Van Hook was permitted to intervene in the case. Van Hook was executed on July 18, 2018. On July 30, 2018, the trial court granted a motion to withdraw Van Hook from the proceedings.

[2] By entry filed July 17, 2018, the trial court granted Jackson's motion to intervene.

{¶ 5}  Appellants separately appealed the trial court's judgment.  O'Neal's appeal was docketed under case No. 19AP-260; Jackson's appeal was docketed under case No. 19AP-289.  This court sua sponte coordinated the cases for purposes of oral argument and determination.  Accordingly, we shall address appellants' appeals in a single decision.

{¶ 6}  O'Neal sets forth the following three assignments of error:

[I.]  The court below erred when it found that Ohio's execution protocol is not a rule subject to the requirements of R.C. 111.15.

[II.] The court erred when it ruled that the ODRC, when it adopted 01-COM-11, did not exceed the scope of its authority and thus did not unconstitutionally usurp legislative authority.

[III.] The court erred when it found that "there is no unconstitutional delegation of authority in this case."

{¶ 7}  Jackson advances the following three assignments of error:

[I.]  The trial court erred when it denied plaintiff's motion for summary judgment and granted defendants' motion for summary judgment on the first claim even though defendants failed to comply with R.C. 111.15 when they enacted an internal management rule (ODRC 01-COM-11).

[II.] The trial court erred when it granted the defendants' motion for summary judgment on the second claim even though defendants' adoption of ODRC 01-COM-11 usurped legislative power reserved to the General Assembly.

[III.] The trial court erred when it granted defendants' motion for summary judgment on the third claim.  The defendants' adoption of ODRC 01-COM-11 was premised on an unlawful delegation of legislative or rulemaking authority by the General Assembly.

{¶ 8}  While appellants have separately appealed the trial court's judgment and set forth separate assignments of error, the issues involved in both appeals are substantially the same, i.e., whether the trial court erred in granting summary judgment to appellees and denying summary judgment to appellants on appellants' claims that (1) ODRC failed to comply with R.C. 111.15 in promulgating 01-COM-11; (2) ODRC usurped the legislative authority of the General Assembly in promulgating 01-COM-11; and (3) the General

Assembly unconstitutionally delegated its legislative authority to ODRC to promulgate 01-COM-11.

{¶ 9}    Appellate review of summary judgment is de novo.  *Andersen v. Highland House Co.,* 93 Ohio St.3d 547, 548 (2001).   " 'When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court.' " *Abrams v. Worthington,* 169 Ohio App.3d 94, 2006-Ohio-5516, at ¶ 11 (10th Dist.), quoting *Mergenthal v. Star Banc Corp.*, 122 Ohio App.3d 100, 103 (12th Dist.1997).  Civ.R. 56(C) provides that a trial court must grant summary judgment when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made.  *Gilbert. v. Summit Cty.*, 104 Ohio St.3d 660, 2004-Ohio-7108, ¶ 6.

{¶ 10}  Here, all parties agree that there are no disputed factual issues in this case; thus, the only issue to be resolved is whether the trial court erred in determining that appellees are entitled to judgment as a matter of law on appellants' claims.

{¶ 11}  In their first assignment[3] of error, appellants contend the trial court erred in concluding that appellees are entitled to summary judgment as a matter of law on their claim that appellees failed to comply with R.C. 111.15 in promulgating 01-COM-11.

{¶ 12}  At the outset, we note appellees' assertion that appellants' claim that 01-COM-11 is invalid and unenforceable because it was not properly promulgated as a rule under R.C. 111.15 cannot be determined in the context of a declaratory judgment action.

{¶ 13}  A declaratory judgment action is a civil action and provides a remedy in addition to other available legal and equitable remedies.  *Aust v. Ohio State Dental Bd.*, 136 Ohio App.3d 677, 681 (10th Dist.2000).  "The essential elements for declaratory relief are: (1) a real controversy exists between the parties; (2) the controversy is justiciable in character; and (3) speedy relief is necessary to preserve the rights of the parties." *Id.*  R.C. 2721.02(A) provides, in part, that "courts of record may declare rights, status, and other legal relations whether or not further relief is or could be claimed. * * * The declaration may be either affirmative or negative in form and effect.  The declaration has the effect of a final

---

[3]  Because appellants' assignments of error are nearly identical, we refer to them in the singular.

judgment or decree." In addition, R.C. 2721.03 provides, in part, that "any person whose rights, status, or other legal relations are affected by a constitutional provision, statute, [or] rule as defined in section 119.01 of the Revised Code * * * may have determined any question of construction or validity arising under the * * * constitutional provision, statute, [or] rule * * * and obtain a declaration of rights, status, or other legal relations under it."

{¶ 14} Appellees contend that R.C. 2721.03 limits the availability of declaratory judgment actions to those cases concerning rules as defined in R.C. 119.01 and does not provide a mechanism for resolving issues pertaining to rules as defined in R.C. 111.15. According to appellees, had the General Assembly so intended, it would have included such reference in R.C. 2721.03 as it did with regard to R.C. Chapter 119 rules. Appellees conclude that because appellants do not allege that 01-COM-11 is a rule as defined in R.C. 119.01, R.C. 2721.03 does not apply.

{¶ 15} Appellants' first cause of action arguably fails to fall within the parameters of a declaratory judgment action. Nonetheless, assuming without deciding, that a declaratory judgment action provides a vehicle for resolving the issue raised in appellants' first cause of action, we address the merits of the assignment of error.

{¶ 16} Agencies such as ODRC that are not subject to the rulemaking requirements in R.C. Chapter 119 are required to promulgate their rules under R.C. 111.15. *State ex rel. Ryan v. State Teachers Retirement Sys.,* 71 Ohio St.3d 362, 366 (1994). R.C. 111.15(A) provides:

> (1) "Rule" includes any rule, regulation, bylaw, or standard having a general operation adopted by an agency under the authority of the laws governing the agency; any appendix to a rule; and any internal management rule. "Rule" does not include any guideline adopted pursuant to section 3301.0714 of the Revised Code, any order respecting the duties of employees, any finding, any determination of a question of law or fact in a matter presented to an agency, or any rule promulgated pursuant to Chapter 119 or division (C)(1) or (2) of section 5117.02 of the Revised Code. "Rule" includes any amendment or rescission of a rule.
>
> (2) "Agency" means any governmental entity of the state and includes, but is not limited to, any board, department, division, commission, bureau, society, council, institution, state college or university, community college district, technical college district, or state community college. "Agency" does not include

the general assembly, the controlling board, the adjutant general's department, or any court.

(3) "Internal management rule" means any rule, regulation, bylaw, or standard governing the day-to-day staff procedures and operations within an agency.

{¶ 17} R.C. 111.15(B)(1) provides in part:

(1) Any rule, other than a rule of an emergency nature, adopted by any agency pursuant to this section shall be effective on the tenth day after the day on which the rule in final form and in compliance with division (B)(3) of this section is filed as follows:

(a) The rule shall be filed in electronic form with both the secretary of state and the director of the legislative service commission;

(b) The rule shall be filed in electronic form with the joint committee on agency rule review. * * *

{¶ 18} Appellees concede that 01-COM-11 was not filed with the secretary of state, the director of the legislative service commission, or the joint committee on agency rule review. The trial court found that 01-COM-11 is an "internal management rule" as defined in R.C. 111.15(A)(3) because it governs ODRC's day-to-day operations in carrying out its statutory duty of execution. The court then asserted that "[a]n internal management rule or standard is exempt from the filing of the rule with any State agency or department and exempts it from the formal R.C. Chapters § 119 and § 111 requirements."[4] (Aug. 4, 2019 Opinion and Jgmt. Entry at 6.)

{¶ 19} We disagree with the trial court's analysis on two fronts. First, 01-COM-11 is not "an internal management rule" as defined in R.C. 111.15(A)(3), as it does not govern "the day-to-day staff procedures and operations within an agency." Executions are not day-to-day procedures or operations. They do not occur on a regular or frequent basis, nor are they routine. Further, even if 01-COM-11 were "an internal management rule," it would not

---

[4] While R.C. 119.01(I) and 111.15(A)(3) have almost identical definitions of "internal management rule," R.C. 119.01(C) specifically states an internal management rule is not a rule under R.C. Chapter 119. In contrast, R.C. 111.15(A)(1) expressly includes internal management rules under R.C. Chapter 111.

be exempt from the requirements of R.C. 111.15(B)(1)(a).[5]  As noted above, R.C. 111.15(A)(1) expressly includes "any internal management rule" in the definition of a "rule," and R.C. 111.15(B)(1)(a) requires that any "rule" be filed in electronic form with the secretary of state and the director of the legislative service commission.

{¶ 20}  Although we have found error in the trial court's analysis, our review is not complete.  "A reviewing court will not reverse a correct judgment merely because a trial court relied on an erroneous reason as the basis for its determination."  *Hassey v. Columbus,* 10th Dist. No. 17AP-726, 2018-Ohio-3958, ¶ 33, citing *Joyce v. Gen. Motors Corp.,* 49 Ohio St.3d 93, 96 (1990).  "In other words, 'when a trial court has stated an erroneous basis for its judgment, an appellate court must affirm the judgment if it is legally correct on other grounds, that is, it achieves the right result for the wrong reason, because such an error is not prejudicial.' "  *Id.,* quoting *Reynolds v. Budzik,* 134 Ohio App.3d 844, 846 (6th Dist.1999), fn. 3.

{¶ 21}  Here, 01-COM-11 is exempt from the filing requirements of R.C. 111.15(B)(1)(a) and (b) because it is not a "rule" pursuant to R.C. 111.15(A)(1).  R.C. 111.15(A)(1) specifically excludes "any order respecting the duties of employees" from the definition of a "rule."  " 'Words used in a statute must be taken in their usual, normal or customary meaning.' "  *State ex rel. Ryan,* 71 Ohio St.3d 362, at 366, quoting *State ex rel. Richard v. Bd. of Trustees of Police & Firemen's Disability & Pension Fund,* 69 Ohio St.3d 409, 412 (1994).  01-COM-11 is an "order respecting the duties of employees" because it establishes the methods, processes, and procedures to be employed by ODRC personnel in carrying out the execution of a condemned inmate. 01-COM-11 is a 21-page document setting forth detailed instructions, procedures, and guidelines to be followed by "all individuals involved in carrying out a court-ordered death sentence."  (01-COM-11, Section III.)  It stands to reason that ODRC employees are the "individuals involved in carrying out a court-ordered death sentence."  The policy sets forth numerous procedures to be accomplished by ODRC personnel 30 days, 14 days, 24 hours, and 15 minutes prior to a scheduled execution, as well as procedures to be employed post-execution.  The policy also includes extensive instructions directing employees in the procurement, preparation, and administration of the drugs to be utilized in the execution process.

---

[5]  R.C. 111.15(D)(4) specifically exempts a proposed internal management rule from the requirement to file an electronic copy with the joint committee on agency rule review.

{¶ 22} Moreover, had the General Assembly intended that ODRC adopt rules pursuant to R.C. 111.15 in implementing an execution policy, it could have enacted legislation expressly stating as much. For example, R.C. 5120.58(A) and (B) specifically direct ODRC to adopt rules under R.C. 111.15 to establish a schedule of health care benefits available to inmates and a program encouraging offenders to use preventive health care services. In the absence of a clear legislative directive mandating that ODRC adopt rules pursuant to R.C. 111.15 in establishing policies related to execution of a death sentence, we conclude that the General Assembly did not intend that such policies be in conformity with those rulemaking procedures.

{¶ 23} Because the General Assembly has not expressly directed ODRC to adopt rules under R.C. 111.15 regarding the execution process, and because 01-COM-11 is not a "rule" as defined in R.C. 111.15(A)(1), ODRC was not required to comply with R.C. 111.15(B)(1)(a) and (b), and the failure to do so does not invalidate 01-COM-11.

{¶ 24} Moreover, even if we were to assume that a declaratory judgment action is not a proper procedural vehicle to challenge appellees' failure to promulgate 01-COM-11 pursuant to R.C. 111.15, appellants also challenge this failure by seeking permanent injunctive relief. "A party seeking a permanent injunction 'must demonstrate by clear and convincing evidence that they are entitled to relief under applicable statutory law, that an injunction is necessary to prevent irreparable harm, and that no adequate remedy at law exists.' " *McDowell v. Gahanna,* 10th Dist. No. 08AP-1041, 2009-Ohio-6768, ¶ 9, quoting *Acacia on the Green Condominium Assn., Inc. v. Gottlieb,* 8th Dist. No. 92145, 2009-Ohio-4878, ¶ 18. Again, appellants have not shown that they are entitled to relief because 01-COM-11 is not a "rule" as defined in R.C. 111.15(A)(1), and therefore, ODRC was not required to comply with R.C. 111.15(B)(1)(a) and (b) when ODRC enacted it.

{¶ 25} For all these reasons, appellants' first assignment of error is overruled.

{¶ 26} Appellants' second and third assignments of error are interrelated and will be addressed together. In their second assignment of error, appellants claim that ODRC usurped legislative power in promulgating 01-COM-11 because it exceeds the scope of the enabling authority granted by the General Assembly. In their third assignment of error, appellants argue that if the General Assembly intended to delegate to ODRC the authority to promulgate 01-COM-11, such delegation violated Section 1, Article II of the Ohio Constitution.

{¶ 27} At the outset, we note that appellants' second and third causes of action plainly fall within the parameters of a declaratory judgment action. As noted above, R.C. 2721.03 permits any person whose rights, status, or other legal relations are affected by a constitutional provision or statute to obtain a declaration of those rights, status, or other legal relation. Appellants' second and third causes of action address both constitutional and statutory provisions.

{¶ 28} Appellants' arguments necessarily implicate the separation of powers doctrine. "The principle of separation of powers into three coequal branches–executive, legislative, and judicial–and the checks and balances that principle ensures are now deemed fundamental to our democratic form of government." *State ex rel. Dann v. Taft,* 109 Ohio St.3d 364, 2006-Ohio-1825, ¶ 55. "Although not explicitly stated in the Ohio Constitution, '[t]he separation-of-powers doctrine implicitly arises from our tripartite democratic form of government and recognizes that the executive, legislative, and judicial branches of our government have their own unique powers and duties that are separate and apart from the others.' " *State v. Fisher*, 4th Dist. No. 16CA3553, 2017-Ohio-7260, ¶ 28, citing *State v. Thompson,* 92 Ohio St.3d 584, 586 (2001). "The separation-of-powers doctrine requires that each branch of government be permitted to exercise its constitutional duties without interference from the other two branches of government." *Dann* at ¶ 56. The doctrine is invoked only when there is some interference by one governmental branch with the constitutional authority of another branch. *State ex rel. AFSCME v. Taft,* 156 Ohio App.3d 37, 2004-Ohio-493, ¶ 31 (3d Dist.). "Pursuant to this doctrine, 'each of the three grand divisions of the government must be protected from the encroachments of the others, so far that its integrity and independence may be preserved.' " *Id.,* citing *South Euclid v. Jemison,* 28 Ohio St.3d 157 (1986).

{¶ 29} ODRC is a statutorily created administrative department of the state of Ohio, which "shall be administered by the director of rehabilitation and correction." R.C. 121.02(P); *AFSCME* at ¶ 35. The General Assembly has authorized ODRC to "maintain, operate, manage, and govern all state institutions for the custody, control, training, and rehabilitation of persons convicted of crime and sentenced to correctional institutions." R.C. 5120.05. R.C. 5120.01 and 5120.36 set forth the powers and duties of ODRC and its director. R.C. 5120.01 states that "[a]ll duties conferred on the various divisions and institutions of the department by law or by order of the director shall be performed under

the rules and regulations that the director prescribes and shall be under the director's control."  R.C. 5120.36 provides that "[t]he department of rehabilitation and correction, in addition to the powers expressly conferred, shall have all power and authority necessary for the full and efficient exercise of the executive, administrative, and fiscal supervision over the state institutions described in section 5120.05 of the Revised Code."  Thus, "R.C. Chapter 5120 appears to grant broad executive powers to the director of ODRC." *AFSCME* at ¶ 36.

{¶ 30}  R.C. 2949.22 governs execution of a court-ordered death sentence.  It states, in relevant part, that "a death sentence shall be executed by causing the application to the person, upon whom the sentence was imposed, of a lethal injection of a drug or combination of drugs of sufficient dosage to quickly and painlessly cause death.  The application of the drug or combination of drugs shall be continued until the person is dead. The warden of the correctional institution in which the sentence is to be executed or another person selected by the director of rehabilitation and correction shall ensure that the death sentence is executed."  R.C. 2949.22(A).

{¶ 31}  Appellees have relied on R.C. 5120.01 and 2949.22 as authorizing the issuance of execution protocols, including 01-COM-11.  Indeed, 01-COM-11 states that it is authorized and issued "in compliance with Ohio Revised Code 5120.01 which delegates to the Director of the Department of Rehabilitation and Correction the authority to manage and direct the total operations of the Department and to establish such rules and regulations as the Director prescribes." (01-COM-11 at 1.)  In addition, 01-COM-11 sets forth R.C. 2949.22 and 2949.25[6] as "RULE/CODE REFERENCE."  (01-COM-11 at 1.)   Gary Mohr, ODRC's director at the time the current version of 01-COM-11 was promulgated, provided uncontroverted deposition testimony that ODRC promulgated 01-COM-11 pursuant to the authority granted by the General Assembly under R.C. 5120.01, R.C. 2949.22 and 2949.25. (Sept. 25, 2018 Mohr Dep. at 11, 13-14, 16, 22, 23.)

{¶ 32}  Appellants contend that neither R.C. 2949.22 nor 5120.01 contain a specific grant of authority to ODRC to design and promulgate a protocol regarding court-ordered executions.  Thus, appellants argue, by promulgating 01-COM-11, ODRC exceeded the scope of the authority delegated to it under those two statutes.  We disagree.

---

[6]  R.C. 2949.25 regulates what persons may be present to witness an execution.

{¶ 33} Administrative policies are a means of accomplishing a legislative end. *Burden v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 11AP-832, 2012-Ohio-1552, ¶ 21, citing *Doyle v. Ohio Bur. of Motor Vehicles,* 51 Ohio St.3d 46, 47 (1990). "[I]f a statute provides the authority for an administrative agency to perform a specified act, but does not provide the details by which the act should be performed, the agency is to perform the act in a reasonable manner based upon a reasonable construction of the statutory scheme." *Northwestern Ohio Bldg. & Constr. Trades Council v. Conrad,* 92 Ohio St.3d 282, 287 (2001), citing *Swallow v. Indus. Comm.*, 36 Ohio St.3d 55, 57 (1988). " '[T]he power of an administrative agency to administer a * * * program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by the legislature.' " *Northwestern* at 289, quoting *Morton v. Ruiz,* 415 U.S. 199, 231 (1974). When agencies promulgate policies and regulations to fill legislative gaps, " 'courts * * * must give due deference to an administrative interpretation formulated by an agency that has accumulated substantial expertise, and to which the General Assembly has delegated the responsibility of implementing the legislative command.' " *Id.,* quoting *Swallow.*

{¶ 34} However, if an administrative policy exceeds the statutory authority granted by the General Assembly, "the agency has usurped the legislative function, thereby violating the separation of powers established in the Ohio Constitution." *McFee v. Nursing Care Mgt. of Am., Inc.,* 126 Ohio St.3d 183, 2010-Ohio-2744, ¶ 24. Policies promulgated by administrative agencies are valid and enforceable unless unreasonable or in conflict with statutory enactments covering the same subject matter. *Williams v. Spitzer Autoworld Canton, L.L.C.,* 122 Ohio St.3d 546, 2009-Ohio-3554, ¶ 18, citing *Hoffman v. State Med. Bd. of Ohio,* 113 Ohio St.3d 376, 2007-Ohio-2201, ¶ 17.

{¶ 35} Here, appellants contend that promulgation of 01-COM-11 exceeded the scope of statutory authority granted by the General Assembly under R.C. Chapter 5120. We disagree. As noted above, R.C. Chapter 5120 grants broad powers to ODRC regarding all aspects of the Ohio prison system. *See* R.C. 5120.01, 5120.05, and 5120.36. These broad powers necessarily include the process by which condemned inmates are executed.

{¶ 36} Appellants also contend that the General Assembly did not grant authority to ODRC to promulgate an execution protocol that is inconsistent with R.C. 2949.22(A). More specifically, appellants argue that 01-COM-11 conflicts with R.C. 2949.22(A) in that it alters the method of execution identified therein, i.e., from "lethal injection" to intravenous

injection. Appellants further argue that this change in the method of execution conflicts with the statutory requirement that the execution be quick and painless.

{¶ 37} The General Assembly has not defined the pertinent terms set forth in R.C. 2949.22(A). Indeed, R.C. 2949.22 fails to define the term "lethal injection," the type of "drug or combination of drugs" to be utilized in administering a "lethal injection," what constitutes a "sufficient dosage" of such "drug or combination of drugs" to "quickly and painlessly cause death," or what constitutes a quick and painless death. The General Assembly's decision not to expressly define these terms evidences its intention that determinations as to the methodology and the drugs to be utilized in conducting a court-ordered execution are matters best left to ODRC, as it is the agency charged with conducting court-ordered executions, has experience in doing so, and is thus better qualified to make determinations regarding the execution process.

{¶ 38} We cannot agree with appellants' contention that use of an intravenous injection as a method of carrying out a "lethal injection" conflicts with R.C. 2949.22(A). Appellants argue that intravenous injection is not synonymous with "lethal injection." Appellants assert that because the term "injection" is not defined in R.C. 2949.22(A), it must be given its common and ordinary meaning, which, according to appellants, is limited to intramuscular injection. Appellants maintain that the trial court erred in interpreting the term "injection" to include an intravenous injection because "there is no reason to speculate that the General Assembly intended the word 'injection' to mean 'IV.' " (O'Neal Brief at 32.)

{¶ 39} However, former ODRC Director Mohr provided uncontroverted testimony establishing that ODRC, as the agency charged by the General Assembly with conducting court-ordered executions, concluded that the term "lethal injection" included intravenous injection. He stated, "[E]xecution by IV injection in my mind and as supported by the medical team that's authorized to administer drugs, an IV injection seems to be the method to comply with the statutory direction of lethal injection. * * * [T]his was discussed through our chief counsel, who pulled folks together * * * [and] it is my belief that an IV injection is the method to comply with the law in the most humane way." (Mohr Dep. at 48-49.)

{¶ 40} Moreover, as noted by appellees, "injection" is defined as the "[i]ntroduction of a medicinal substance or nutrient material into the subcutaneous cellular tissue (subcutaneous or hypodermic), the muscular tissue (intramuscular), *a vein (intravenous)*

* * * or other canals or cavities of the body.' " (Emphasis added.) *Stedman's Medical Dictionary Third Unabridged Lawyers' Edition* at 635 (1972). Thus, appellants' contention that the term "injection" contemplates only intramuscular injection is contrary to medical authority.

{¶ 41} Furthermore, a sampling of Ohio case law reveals that the term "injection" is often used in conjunction with the term "intravenous." *See, e.g., Sellers v. Knox Community Hosp.,* 5th Dist. No. 16 CA 12*,* 2016-Ohio-8566, ¶ 6 (intravenous injections of dilaudid); *Cobb v. Shipman*, 11th Dist. No. 2013-T-0117, 2015-Ohio-2604, ¶ 4 (intravenous injection of pitocin); *State v. Drummond,* 7th Dist. No. 05 MA 197, 2006-Ohio-7078, ¶ 99 (intravenous injection of high dose potassium); *Moore v. Univ. of Cincinnati Hosp.*, 93 Ohio App.3d 616, 617 (10th Dist.1994) (intravenous morphine injection); *State v. Baker,* 9th Dist. No. C.A. No. 16785 (Jan. 25, 1995) (lethal dose of morphine administered by intravenous injection); *Dowler v. Bath,* 1st Dist. No. C-910428 (Nov. 25, 1992) (intravenous injection of both nitroglycerin and heparin); *Mulloff v. Natl. Acc. & Health Ins.,* 67 Ohio App. 464, 465 (8th Dist.1941) (doctor administered intravenous injection of poison compound). While these cases did not consider whether the term "injection" contemplates an "intravenous" injection in the context of an inmate execution, they do establish that the term "injection" encompasses an intravenous injection, not just an intramuscular injection.

{¶ 42} In addition, despite appellants' assertions to the contrary, 01-COM-11 does not circumvent the requirement in R.C. 2949.22(A) that a condemned inmate's death be quick and painless. 01-COM-11 sets forth three alternative drug combinations, all of which are to be administered intravenously. Two of the three drugs, pentobarbital and thiopental sodium, both barbiturates, are no longer available for use in executions. *Glossip v. Gross,* 135 S.Ct. 2726, 2733 (2015). The remaining option involves the administration of a three-drug protocol consisting of midazolam hydrochloride, followed by a paralytic agent and then potassium chloride. Midazolam hydrochloride is "a sedative in the benzodiazepine family of drugs." *Id.* at 2734. A paralytic agent " 'inhibits all muscular-skeletal movements and, by paralyzing the diaphragm, stops respiration.' " *Id.* at 2732, quoting *Baze v. Rees,* 553 U.S. 35, 44 (2008). Pursuant to 01-COM-11, the paralytic agent may be pancuronium bromide, vecuronium bromide, or rocuronium bromide, three drugs that are "functionally equivalent." *Id.* at 2735. Potassium chloride " 'interferes with the electrical signals that stimulate the contractions of the heart, inducing cardiac arrest.' " *Id.* at 2732.

{¶ 43} The procedures set forth in 01-COM-11 provide for the medical team to establish one or two viable IV sites and allow as much time as necessary to do so. The medical team tests the viability of the IV site with a low-pressure saline drip through IV tubing. In the event a viable IV site cannot be established, the medical team consults with the warden, the ODRC director, and auxiliary team members to determine whether or how long to continue efforts to establish a viable IV site. (01-COM-11 at 15-16). Once a viable IV site has been established, the drug administrator intravenously administers the midazolam hydrochloride and assesses the inmate's consciousness. If the inmate is found to be unconscious, the process continues with the intravenous administration of the paralytic agent and the potassium chloride. Following administration of the drugs, the drug administrator inspects the IV site for evidence of incontinence or infiltration and assesses the inmate's breathing and heart sounds. At the completion of the process and after a sufficient time for death to have occurred, an appropriate medical professional evaluates the inmate to confirm death. (01-COM-11 at 17-18.)

{¶ 44} Former ODRC Director Mohr testified that at the time 01-COM-11 was adopted, the process was "expected" to take 15-20 minutes from injection of the first drug to death. (Mohr Dep. at 118-19.) Appellants contend this 15-20 minute death is not the "quick" death described in R.C. 2949.22(A). We first note that Mohr's testimony regarding the 15-20 minute time frame is merely an estimate and cannot be relied upon to establish a definitive time frame. Further, the Supreme Court of Ohio found that the insertion of intravenous lines was "a necessary preliminary step" but that "the statute makes clear, the execution commences when the lethal drugs enters the IV line." *State v. Broom,* 146 Ohio St.3d 60, 2016-Ohio-1028, ¶ 26. We construe this assertion to establish that the "quick and painless" requirement of R.C. 2949.22 applies only once the drugs flow into the inmate's body. In addition, none of the parties presented any documentary or testimonial evidence of a scientific or medical nature establishing exactly how long it would take for death to occur using the three-drug protocol set forth in 01-COM-11. We thus cannot find that 01-COM-11 conflicts with the mandate in R.C. 2949.22(A) that death be quick.

{¶ 45} Appellants further contend that the three-drug protocol set forth in 01-COM-11 conflicts with R.C. 2949.22(A) because it does not ensure that death is painless. Appellants contend that the execution protocol permits painful "multiple cutting/wounding/and other offenses" to be inflicted on the inmate before the execution

begins. (O'Neal Brief at 40.) However, as noted above, the *Broom* court determined that the insertion of intravenous lines was a "necessary preliminary step" in the execution process. *Id.* Appellants also contend that "[t]here is no dispute that the third drug given in the sequence [potassium chloride] is known to cause pain * * * that the paralytic [agent] does not stop pain, * * * [and that] [t]he first drug, midazolam is not designed to stop pain and has a short span of effectiveness for inducing unconsciousness." (O'Neal Brief at 34-35.) However, appellants failed to provide documentary or testimonial evidence in support of these assertions. Furthermore, appellants' claim regarding midazolam hydrochloride contradicts that of the United States Supreme Court in *Glossip,* where the Court stated that midazolam "is likely to render an inmate insensate to pain that might result from administration of the paralytic agent and potassium chloride." *Id.* at 2739-40. Thus, the three-drug protocol set forth in 01-COM-11, which includes the administration of midazolam hydrochloride, a drug the United States Supreme Court has found to "render an inmate insensate to pain," does not conflict with the mandate in R.C. 2949.22(A) that an inmate's death be painless.

{¶ 46} Appellants finally contend that 01-COM-11 impermissibly impedes an inmate's right to counsel by (1) imposing search procedures on defense counsel prior to consultation with the condemned inmate on the day prior to the scheduled execution, (2) permitting only cell-front attorney-client meetings on the morning of the scheduled execution, and (3) limiting defense counsel's telephone access on the day of execution to an internal prison telephone. Appellants cite no authority establishing that the procedures set forth in 01-COM-11 unduly hinder a condemned inmate's access to counsel prior to the scheduled execution.

{¶ 47} Moreover, former ODRC Director Mohr explained why the foregoing procedures were implemented. Mohr described the search requirement as "a fundamental security practice in that it is to prevent specific contraband from being passed." (Mohr Dep. at 60-61.) He further averred that the search requirement resulted from a compromise, i.e., in exchange for not having staff members physically present in the area near the attorney/client discussions, defense counsel would submit to a search. *Id.* Mohr further testified that restrictions on cell-front visitation and a ban on defense counsel's use of a personal cellphone on the day of execution were developed by execution team members and submitted to federal court to ensure compliance with Ohio law. (Mohr Dep. at 66-67.)

Appellants have not provided any evidence contradicting Mohr's assertions or establishing how or why these measures unconstitutionally impede attorney/client communications.

{¶ 48} For the foregoing reasons, we conclude that ODRC did not usurp legislative authority in establishing and implementing 01-COM-11 for the purpose of carrying out court-ordered executions in the state of Ohio. Accordingly, appellants' second assignment of error is overruled.

{¶ 49} As to appellants' third assignment of error, our determination that ODRC did not usurp legislative authority in promulgating 01-COM-11 informs our analysis as to appellants' contention that the General Assembly improperly delegated its legislative authority to ODRC to promulgate 01-COM-11.

{¶ 50} The legislative power of the state is vested in the General Assembly pursuant to Section 1, Article II of the Ohio Constitution. *Matz v. J.L. Curtis Cartage Co.,* 132 Ohio St. 271, 279 (1937). One constitutional limitation on the General Assembly is the prohibition against delegating the legislative power to make laws. *State ex rel. Bryant v. Akron Metro. Park Dist.,* 120 Ohio St. 464, 478 (1929). Given that limit, however, the General Assembly constitutionally may delegate authority to promulgate rules, policies, and regulations to subordinate boards and agencies. *Princeton City School Dist. Bd. of Edn. v. Ohio State Bd. of Edn.*, 96 Ohio App.3d 558, 560 (1st Dist.1994), citing *Belden v. Union Cent. Life Ins. Co.,* 143 Ohio St. 329, 342 (1st Dist.1994).

{¶ 51} "Delegation of rulemaking authority is a necessary response to the increasing complexity of modern government." *Id.,* citing *In re Adoption of Uniform Rules and Regulations Relating to Valuation of Real Property,* 169 Ohio St. 445, 455 (1959). As a general matter, if the General Assembly provides a sufficient policy statement in the enabling statute, the delegation of rulemaking is proper. *Id.,* citing *In Re Rules* at 455.

{¶ 52} Appellants contend that the General Assembly has provided no legislative guidance in establishing the execution protocol and thus has improperly provided ODRC unfettered discretion to implement law and public policy. Contrary to appellants' assertions, we find that the General Assembly has provided sufficient legislative guidance in establishing the execution protocol. In enacting R.C. 2949.22, the General Assembly clearly defined the punishment to be imposed for certain crimes, i.e., death. Thus, contrary to appellants' assertion, the General Assembly did not provide ODRC any discretion to define the elements of the crimes subject to punishment by death. Furthermore, R.C.

2949.22 sets forth the method by which the death penalty will be carried out, i.e., lethal injection. Thus, the General Assembly did not provide ODRC any discretion to determine a different method of execution, such as lethal gas, electrocution, or hanging. The General Assembly could properly delegate to ODRC responsibility to establish procedures for implementing the statutory directive, given ODRC's experience in conducting executions of condemned inmates.

{¶ 53} Indeed, former ODRC Director Mohr testified that the purpose of ODRC's execution protocol was to achieve the legislative purpose by making the process "a humane execution for everyone." (Mohr Dep. at 36.) He further testified that "the drugs that were chosen * * * were chosen through the research that came to me that indicated that those drugs would result in a peaceful end of life * * * and the drugs in the protocol were utilized with that belief." (Mohr Dep. at 39.) Again, appellants have provided no evidence refuting Mohr's assertions.

{¶ 54} Thus, the distinction here is clear – via R.C. 2949.22, the General Assembly has established the law regarding court-ordered executions. R.C. 2949.22 specifies the purpose of the statute, the punishment to be imposed, and generally identifies the means to accomplish the purpose. Rather than delegating to ODRC the power to make the law, the General Assembly has delegated to ODRC only the power to determine details and implement a policy to carry out the law set forth by the General Assembly. Indeed, former versions of R.C. 2949.22 provided that a death sentence be executed by electrocution without stating the precise means, manner, or amount of voltage to be applied in carrying out the electrocution. Accordingly, we conclude that the current version of R.C. 2949.22 requiring death by lethal injection is not so indefinite as to constitute an improper delegation of legislative power.

{¶ 55} Decisions of other state courts considering similar execution protocol delegation-of-authority arguments support our conclusion in the present case. *See Zink v. Lombardi*, W.D.Mo. No. 2:12-CV-4209-NKL, 2012 U.S. Dist. LEXIS 191818 (Missouri legislature established general policy to conduct execution by lethal gas or injection and agency could reasonably fill in details regarding protocol and method of execution); *Cook v. State*, 230 Ariz. 185 (2012) (statute directing Arizona Department of Corrections to supervise infliction of death penalty by injection with lethal substances provides definite policy and rule of action to guide department); *State v. Ellis,* 281 Neb. 571, 592-93 (2011)

(implementation of an execution protocol is highly technical and requires a course of continuous decision, making it appropriate for the legislature to delegate it); accord *Sims v. State*, 754 So.2d 657, 668-70 (Fla.2000); *State v. Osborn*, 102 Idaho 405 (Idaho1981); *Sims v. Kernan,* 30 Cal.App.5th 105 (2018).

**{¶ 56}** Accordingly, for all the foregoing reasons, we conclude that the General Assembly did not unconstitutionally delegate its authority to ODRC to establish and implement 01-COM-11 for the purpose of carrying out court-ordered executions in the state of Ohio.  Accordingly, appellants' third assignment of error is overruled.

**{¶ 57}** Having determined that there is no constitutional or legislative impediment preventing ODRC from promulgating a protocol governing court-ordered executions in the state of Ohio, we find that the trial court did not err in granting summary judgment to appellees on appellants' claims for declaratory and injunctive relief.

**{¶ 58}** Having overruled appellants' three assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and BEATTY BLUNT, JJ., concur.

———————————