[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *O'Neal v. State*, Slip Opinion No. 2021-Ohio-3663.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2021-OHIO-3663

O'NEAL, APPELLANT, ET AL. *v*. THE STATE OF OHIO ET AL., APPELLEES.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *O'Neal v. State*, Slip Opinion No. 2021-Ohio-3663.]

*Execution protocol— R.C. 111.15—Ohio's execution protocol is not a rule having a general and uniform operation—Court of appeals' judgment affirmed.*

Nos. 2020-0676 and 2020-0683—Submitted June 30, 2021—Decided October 19, 2021.

APPEALS from the Court of Appeals for Franklin County, Nos. 19AP-260 and 19AP-289, 2020-Ohio-506.

_____

**FISCHER, J.**

{¶ 1} The Department of Rehabilitation and Correction ("DRC") is responsible for carrying out death sentences in Ohio.  *See* R.C. 2949.22(A) and (B).  In furtherance of its duty, DRC has adopted a written execution protocol: a document that sets forth the specific process by which DRC personnel are to carry out death sentences by lethal injection.

{¶ 2} In these appeals, two condemned inmates contend that DRC may adopt the execution protocol only by following the procedures for promulgating it as an administrative rule in accordance with R.C. 111.15(B), and that until this is done, the protocol is invalid and may not be used to carry out death sentences.

## I. Facts and Procedural History

{¶ 3} Both appellants, Cleveland Jackson (case No. 2020-0676) and James D. O'Neal (case No. 2020-0683) (collectively, "the inmates") have been convicted of aggravated murder and sentenced to death. *See State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173; *State v. O'Neal*, 87 Ohio St.3d 402, 721 N.E.2d 73 (2000). The appellees in both cases are the state of Ohio and DRC (collectively, "the state").

{¶ 4} DRC has maintained a written execution protocol since 1994. The protocol has gone through 20 versions; the current one, designated DRC policy 01-COM-11, took effect on October 7, 2016. *See* Ohio Department of Rehabilitation and Correction, https://drc.ohio.gov/LinkClick.aspx?fileticket=-r0rnCS3AGc%3d&portalid=0 (accessed Aug. 3, 2021) [https://perma.cc/N8UU-C9EF]. In adopting 01-COM-11, DRC did not follow Ohio's procedures for formal rulemaking set forth in R.C. 111.15. Specifically, DRC "did not file the protocol with any State entity." *O'Neal v. State*, Franklin C.P. No. 18CVH-01-758, at 2 (Apr. 4, 2019).

{¶ 5} In 2018, O'Neal filed a complaint in the Franklin County Court of Common Pleas seeking an injunction halting his execution and a declaration that the protocol is invalid. The trial court subsequently permitted Jackson to intervene in the lawsuit. The inmates and the state filed motions for summary judgment; the trial court granted the state's motion, denied those of the inmates, and entered summary judgment in the state's favor. *O'Neal*, Franklin C.P. No. 18CVH-01-758, at 1. The court of appeals affirmed the trial court's judgment. 2020-Ohio-506, 146 N.E.3d 605.

{¶ 6} Jackson and O'Neal each filed discretionary appeals in this court. We granted review of Jackson's and O'Neal's first propositions of law. *See O'Neal v. State*, 160 Ohio St.3d 1418, 2020-Ohio-4811, 154 N.E.3d 97; *O'Neal v. State*, 160 Ohio St.3d 1418, 2020-Ohio-4811, 154 N.E.3d 98.

{¶ 7} Jackson's first proposition of law is: "Ohio's execution protocol 01-COM-11 governs the day-to-day staff procedures and operations by which DRC carries out a core statutory function—the execution of condemned persons—and thus is a 'rule' subject to R.C. 111.15." O'Neal's first proposition of law is: "DRC's execution protocol 01-COM-11 is subject to the rule-making requirements of R.C. 111.15 and is invalid for failing to comply with the statute."

## II. Standing

{¶ 8} Before examining those issues, we will consider the state's challenge to the inmates' standing.

{¶ 9} The state contends that the inmates lack standing to sue over the validity of DRC's execution protocol. Standing is a " 'jurisdictional requirement' that must be met for a party to maintain a lawsuit." *Ohioans for Concealed Carry, Inc. v. Columbus*, 164 Ohio St.3d 291, 2020-Ohio-6724, 172 N.E.3d 935, ¶ 42, quoting *State ex rel. Dallman v. Franklin Cty. Court of Common Pleas*, 35 Ohio St.2d 176, 179, 298 N.E.2d 515 (1973).

{¶ 10} "[S]tanding depends on whether the plaintiffs have alleged such a personal stake in the outcome of the controversy that they are entitled to have a court hear their case." *ProgressOhio.org, Inc. v. JobsOhio*, 139 Ohio St.3d 520, 2014-Ohio-2382, 13 N.E.3d 1101, ¶ 7. Standing has three elements: injury, causation, and redressability. *Moore v. Middletown*, 133 Ohio St.3d 55, 2012-Ohio-3897, 975 N.E.3d 977, ¶ 22. Thus, to establish standing, the inmates must show that they suffered an injury that is fairly traceable to the state's allegedly illegal conduct and that their injury is likely to be redressed by the relief they are

requesting. *See id.* The state contends that the inmates' standing fails on the third element: redressability.

{¶ 11} As the inmates point out, they themselves are the objects of the injurious state action: their executions will be carried out under an assertedly invalid protocol. That makes their claim to standing a strong one.

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

{¶ 12} However, the state points out that an alleged injury is not redressable when a ruling in the plaintiff's favor would leave the plaintiff subject to the same injury from which he seeks relief. *See State ex rel. Walgate v. Kasich*, 147 Ohio St.3d 1, 2016-Ohio-1176, 59 N.E.3d 1240, ¶ 27 (lead opinion) (holding that an injury was nonredressable because "[e]ven if the state's actions were nullified," the alleged injury "would continue to exist").

{¶ 13} The state contends that the injury alleged by the inmates is that they "do not want to be executed in the manner provided for by the protocol." According to the state, because DRC has statutory authority to carry out death sentences and no statute requires that it adopt an execution protocol, winning this case would not actually benefit the inmates. Hence, the state argues, if the execution protocol, 01-

COM-11, is declared invalid, DRC could simply execute the inmates pursuant to its statutory authority "in precisely the same manner provided for by the protocol."

{¶ 14} But "standing turns on the nature and source of the claim asserted by the plaintiffs." *Moore*, 133 Ohio St.3d 55, 2012-Ohio-3897, 975 N.E.3d 977, at ¶ 23. And the state's argument, we think, misconceives the nature of the inmates' claim.

{¶ 15} Contrary to the state's assertion, the injury alleged in this case is not that the inmates are to be executed in any particular fashion. It is alleged that they are to be executed in accordance with a protocol that is legally invalid because it was not promulgated as an administrative rule under R.C. 111.15(B). That alleged injury could be redressed by a declaration that the protocol is invalid.

{¶ 16} Although the state does not raise the point, we acknowledge that a declaratory-judgment action is not a proper means to litigate some of the challenges to the protocol's validity. Indeed, we have held: "There is no state postconviction relief or other state-law mode of action to litigate the issue of whether a specific lethal-injection protocol is constitutional under *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1250, 170 L.Ed.2d 420 (2008), or under Ohio law." *Scott v. Houk*, 127 Ohio St.3d 317, 2010-Ohio-5805, 939 N.E.2d 835, ¶ 4. But "*Scott* does not foreclose every possible avenue for raising a protocol challenge in Ohio courts." *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 75. The instant case does not involve a state or federal constitutional challenge to the protocol, and *Scott* does not address whether a state-law cause of action, such as declaratory judgment, may be used to challenge an execution protocol on nonconstitutional grounds.

{¶ 17} In any event, the availability of declaratory judgment goes to the merits of the action; it does not affect the inmates' standing. The fact remains that should the inmates obtain the judgment they seek, it will provide them with redress, which disposes of the state's redressability argument.

**{¶ 18}** We also reject the state's contention that because no Ohio statute requires DRC to adopt an execution protocol, it may execute condemned inmates without a protocol yet in the same manner that is specified in the protocol. This argument draws an empty distinction between the protocol and the procedures specified in the protocol. Those procedures *are* the protocol, and in following them, DRC would be following the protocol.

**{¶ 19}** In any event, DRC's execution procedures have been the subject of frequent Eighth Amendment litigation. In that litigation, federal courts have required DRC not only to have an execution protocol, but to follow it consistently. Indeed, federal courts have stayed scheduled executions because of DRC's failures to consistently follow its own protocol. *See*, *e.g.*, *Reynolds v. Strickland*, 583 F.3d 956, 957 (6th Cir.2009) (staying execution in light of serious questions about "whether Ohio is fully and competently adhering to the Ohio lethal injection protocol"); *In re Ohio Execution Protocol Litigation*, 671 F.3d 601, 602 (6th Cir.2012) (denying the state of Ohio's motion to vacate the district court's order staying an execution due to the state's "persistent failure or refusal * * * to follow its own written execution protocol"). Given this history, we do not see how DRC would be able to execute condemned inmates without an execution protocol.

**{¶ 20}** We conclude that the injury alleged by the inmates is redressable and that they "have alleged such a personal stake in the outcome of the controversy that they are entitled to have a court hear their case." *ProgressOhio.org*, 139 Ohio St.3d 520, 2014-Ohio-2382, 13 N.E.3d 1101, at ¶ 7. The inmates have standing to challenge the legality of the execution protocol. Accordingly, we now proceed to address the merits of their arguments.

### III. Merits

**{¶ 21}** In most circumstances, R.C. 111.15 creates a procedure that state agencies must adhere to when promulgating rules. Of specific relevance to this case, R.C. 111.15(B)(1)(a) provides that a rule adopted pursuant to R.C. 111.15

may take effect only after the adopting agency has filed it with the secretary of state and the director of the Ohio Legislative Service Commission ("LSC"):

> Any rule * * * adopted by any agency pursuant to this section shall be effective on the tenth day after the day on which the rule in final form and in compliance with division (B)(3) of this section is filed as follows:
>
> (a) The rule shall be filed in electronic form with both the secretary of state and the director of the legislative service commission * * *.

The rule must also be filed with the Joint Committee on Agency Rule Review ("JCARR"), R.C. 111.15(B)(1)(b), unless it is exempt from legislative review under R.C. 111.15(D)(1) through (7).

{¶ 22} R.C. 111.15(B)(1) applies to "any rule" adopted by "any agency." R.C. 111.15(A) supplies definitions of both "rule" and "agency":

> (A) As used in this section:
>
> (1) "Rule" includes any rule, regulation, bylaw, or standard having a general and uniform operation adopted by an agency under the authority of the laws governing the agency; any appendix to a rule; and any internal management rule. "Rule" does not include * * * any order respecting the duties of employees * * *.
>
> (2) "Agency" means any governmental entity of the state and includes * * * any * * * department * * *.
>
> (3) "Internal management rule" means any rule, regulation, bylaw, or standard governing the day-to-day staff procedures and operations within an agency.

**{¶ 23}** The parties do not dispute that DRC is an "agency" within the meaning of R.C. 111.15(A)(2) or that the protocol was adopted by DRC under the authority of the laws governing DRC. Thus, the dispositive issue is whether the execution protocol constitutes a "rule" as defined in R.C. 111.15(A)(1).

**{¶ 24}** If the execution protocol is either a "rule, regulation, bylaw, or standard having a general and uniform operation" or an "internal-management rule," then it fits under the definition of a "rule" under R.C. 111.15(A)(1). If the protocol does not fit into either one of those categories or if it is an "order respecting the duties of employees," *id*., then it is not a "rule" and is therefore not subject to the statute's rule-filing requirements.

**{¶ 25}** The inmates contend that DRC should have filed the execution protocol with the secretary of state and LSC's director because the protocol is a "rule * * * having a general and uniform operation" in accordance with R.C. 111.15(A)(1) or, alternatively, because it is an internal-management rule as defined by R.C. 111.15(A)(3). We will examine both contentions.

*A. Is the execution protocol a rule having a general and uniform operation?*

**{¶ 26}** There is little authority interpreting the meaning of "rule" in R.C. 111.15(A)(1). However, Ohio's Administrative Procedure Act, R.C. Chapter 119, defines the word "rule" with similar language: "any rule, regulation, or standard, having a general and uniform operation, adopted, promulgated, and enforced by any agency under the authority of the laws governing such agency." R.C. 119.01(C). We will therefore look to our precedents applying R.C. 119.01(C) to help us construe R.C. 111.15(A).

**{¶ 27}** In applying the definition of "rule" in R.C. 119.01(C), we have distinguished between an administrative action that establishes a policy or standard and one that merely implements or interprets a rule or statute that already exists. *See Adams v. Testa*, 152 Ohio St.3d 207, 2017-Ohio-8853, 94 N.E.3d 539, ¶ 37;

8

*State ex rel. Saunders v. Indus. Comm.*, 101 Ohio St.3d 125, 2004-Ohio-339, 802 N.E.2d 650, ¶ 27. An action that establishes a new policy or standard is a rule under R.C. 119.01(C); one that implements or interprets a pre-existing rule or statute is not. *See Saunders* at ¶ 27 ("The pivotal issue in determining the effect of a document is whether it enlarges the scope of the rule or statute from which it derives rather than simply interprets it").

{¶ 28} Indeed, in *Ohio Nurses Assn., Inc. v. State Bd. of Nursing Edn. & Nurse Registration*, 44 Ohio St.3d 73, 540 N.E.2d 1354 (1989), we held that the Ohio State Board of Nursing Education and Nurse Registration's decision, which was issued in a "position paper," to greatly expand the authority of licensed practical nurses ("LPNs") to administer intravenous fluids fell within the statutory definition of a "rule." The position paper "enlarge[d] the scope of practice for LPNs" beyond what any existing statute or rule authorized. *Id*. at 75. Hence, "the [position] paper [did] not purport merely to interpret an extant statute or rule, but rather to establish a new rule, standard or regulation regarding LPN practice." *Id*.

{¶ 29} Likewise, in *Fairfield Cty. Bd. of Commrs. v. Nally*, 143 Ohio St.3d 93, 2015-Ohio-991, 34 N.E.3d 873, we held that a limitation on phosphorus discharge imposed by the Ohio Environmental Protection Agency was a "standard" having a "general and uniform operation" and was therefore a "rule" that had to be filed in accordance with the Administrative Procedure Act. We explained that the discharge limit "prescribe[d] a legal standard that did not previously exist," *id*. at ¶ 29, and "create[d] new legal obligations," *id*. at ¶ 32. Moreover, it "applie[d] to a large segment of the public rather than a narrow group" and was thus "generally and uniformly applicable." *Id*. at ¶ 30.

{¶ 30} By contrast, "[d]ocuments that explain, rather than expand, fall outside [the definition of 'rule' contained in] R.C. Chapter 119." *Saunders*, 101 Ohio St.3d 125, 2004-Ohio-339, 802 N.E.2d 650, at ¶ 33. To illustrate this principle, *Saunders* examined *Princeton City School Dist. Bd. of Edn. v. Ohio State*

*Bd. of Edn.*, 96 Ohio App.3d 558, 645 N.E.2d 773 (1st Dist.1994). *Princeton* involved a legislatively created statewide computer-information network for public schools. The state board of education established "guidelines" for the compilation, collection, and reporting of data in conjunction with the network. The First District held in *Princeton* that the guidelines were not rules and did not have to be formally promulgated in compliance with the Administrative Procedure Act because

> [t]he guidelines * * * are a kind of instruction manual showing methods and alternatives to identify, compile, collect and report the data. * * * [T]hese guidelines merely control the procedure by which the duties in the statute and rule must be performed * * *.

*Princeton* at 563-564.

{¶ 31} The execution protocol in 01-COM-11 has little in common with the kind of edicts that we have found that fit within the statutory definition of "rule." It creates neither a "legal standard," *Nally* at ¶ 29, nor a "legal obligation[]," *id*. at ¶ 32. Unlike the position paper in *Ohio Nurses*, 01-COM-11 does not expand anyone's functions or abilities; the obligation to execute death sentences by lethal injection is already conferred on DRC by statute, and the protocol "is merely the implementation * * * of a rule already in existence." *Adams*, 152 Ohio St.3d 207, 2017-Ohio-8853, 94 N.E.3d 539, at ¶ 37. And unlike the discharge limit in *Nally*, the execution protocol applies only to "a narrow group" rather than to "a large segment of the public," *Nally* at ¶ 30; thus, while it is intended to operate uniformly to "all individuals involved in carrying out a court-ordered death sentence," 01-COM-11 at 1, it does not have a "*general* and uniform operation [emphasis added]," R.C. 119.01(C).

{¶ 32} Like the guidelines at issue in *Princeton*, the execution protocol described in 01-COM-11 amounts to an instruction manual: it is a 21-page, step-

by-step, minutely detailed directive explaining precisely how DRC personnel are to administer a lethal injection to a condemned inmate, from start to finish.

{¶ 33} The execution protocol in 01-COM-11 provides for (1) the selection of specific drugs to be used in an execution, (2) ordering and testing the drugs before an execution, (3) securely storing and handling the drugs before and after an execution, (4) physical- and mental-health evaluations of the prisoner, (5) training and rehearsal by the personnel involved in an execution, (6) how and when to inventory the prisoner's effects, (7) allowing visitors, (8) the prisoner's "special meal," *id*. at 11, (9) reading the death warrant aloud, and (10) the prisoner's last words. The protocol lays out what is to take place 30 days, 14 days, and 24 hours before a scheduled execution and on the day of the execution.

{¶ 34} The step-by-step procedure for preparing the lethal-injection drugs consists of two and a half pages. The procedure for the execution itself, i.e., the establishment of intravenous sites, insertion of the needles, consciousness checks, and administration of the drugs, consists of five pages. The protocol precludes deviation from some provisions and specifies that only DRC's director may authorize deviations from others. It also requires that certain actions be documented. Finally, it provides for post-execution debriefings and performance reviews of the execution team. Specific duties are assigned to DRC's director, the warden, the execution team, the execution-team leader, the medical team, the drug administrators, and others.

{¶ 35} In short, 01-COM-11 "control[s] the procedure by which the duties [imposed] in the statute * * * must be performed." *See Princeton*, 96 Ohio App.3d at 564, 645 N.E.2d 773. Accordingly, we hold that the execution protocol is not a "rule * * * having a general and uniform operation," R.C. 111.15(A)(1).

{¶ 36} The inmates support their argument that 01-COM-11 is a rule and that "[t]he failure to comply with R.C. 111.15 filing requirements invalidates the proposed rule" with two cases that applied a former version of R.C. 111.15: *State*

*ex rel. N. Canton Exempted Village School Dist. Bd. of Edn. v. Holt*, 174 Ohio St. 55, 186 N.E.2d 862 (1962), and *State ex rel. Ryan v. State Teachers Retirement Sys.*, 71 Ohio St.3d 362, 643 N.E.2d 1122 (1994). Both *Holt* and *Ryan* held that certain resolutions adopted by the School Employees Retirement Board were invalid and could not be implemented because those resolutions had not been filed with the secretary of state pursuant to the versions of R.C. 111.15 in effect at that time. *Holt* at 56-57 (applying Am.Sub.H.B. No. 317, 136 Ohio Laws, Part II, 2399, 2400-2401); *Ryan* at 365-366 (applying Sub.S.B. No. 359, 144 Ohio Laws, Part II, 2391, 2398-2401).

{¶ 37} But it is the *current* version of R.C. 111.15 that concerns us today, and *Holt* and *Ryan* provide little help in construing it. Neither *Holt* nor *Ryan* applied the current definition of "rule" in R.C. 111.15(A)(1), because the resolutions at issue in those cases were adopted *before* the General Assembly enacted that definition. In fact, the versions of R.C. 111.15 that we applied in *Holt* and *Ryan* did not define the word "rule." *See Ryan* at 366 (discussing and applying *Holt*). Rather, in *Ryan*, the court used *Black's Law Dictionary* to define the word "rule": "A 'rule' is '[a]n established standard, guide, or regulation' and a 'regulation' is a '[r]ule of order prescribed by superior or competent authority relating to action of those under its control.' " (Brackets added in *Ryan*.) *Ryan* at 366, quoting *Black's Law Dictionary* 1331, 1286 (6th Ed.1990). This definition is significantly broader than the definition adopted by the General Assembly. Therefore, we do not find the analyses in *Holt* or *Ryan* persuasive.

{¶ 38} In support of his argument that the execution protocol in 01-COM-11 is a rule having a general and uniform operation, Jackson also relies heavily on two cases construing R.C. 111.15: *Ohio Assn. of Cty. Bds. of Mental Retardation & Dev. Disabilities v. Pub. Emps. Retirement Sys.*, 61 Ohio Misc.2d 836, 585 N.E.2d 597 (C.P.1990) ("*Assn. of MRDD Bds.*"), and *B&T Express, Inc. v. Pub. Util. Comm.*, 145 Ohio App.3d 656, 763 N.E.2d 1241 (10th Dist.2001).

{¶ 39} In *Assn. of MRDD Bds.*, the common pleas court interpreted the phrase "general and uniform operation" from R.C. 111.15 as follows: "The statute does not require that the rule be broadly applied statewide. It is only required that the proposed rule be uniformly applied by the promulgating agency *to those affected by the rule*." (Emphasis added.) *Assn. of MRDD Bds.* at 842-843; *accord B&T Express* at 665.

{¶ 40} But we have not adopted any such interpretation of the phrase "general and uniform operation." To the contrary, in *Nally*, one of the factors we considered in determining whether a rule was generally and uniformly applicable was whether it "applie[d] to a large segment of the public rather than a narrow group." *Id.*, 143 Ohio St.3d 93, 2015-Ohio-991, 34 N.E.3d 873, at ¶ 30. Accordingly, we decline to adopt the reading of R.C. 111.15(A)(1) that was set forth in *Assn. of MRDD Bds.*

### B. *Is the execution protocol an internal-management rule?*

{¶ 41} Even if the execution protocol is not a "rule * * * having a general and uniform operation," R.C. 111.15(A)(1), it still must be filed in accordance with the statute if it is an internal-management rule, because R.C. 111.15(A)(1) includes internal-management rules within the definition of the word "rule."

{¶ 42} R.C. 111.15(A)(3) defines the term "internal-management rule" as "any rule, regulation, bylaw, or standard governing the day-to-day staff procedures and operations within an agency." In this case, the trial court concluded that the protocol is an internal-management rule because it "governs the operations of" DRC.[1] But the Tenth District held otherwise:

---

1. The trial court nonetheless concluded that the protocol was not a rule, because that court mistakenly thought that internal-management rules were exempt from the rule-filing requirements of R.C. 111.15(B). In fact, R.C. 111.15(A)(1)'s definition of "rule" *includes* internal-management rules. Internal-management rules are exempt from filing with JCARR, *see* R.C. 111.15(D)(4), but must still be filed with the secretary of state and LSC. *Compare* R.C. 119.01(C) (defining "rule" to generally *exclude* internal-management rules).

> 01-COM-11 is not "an internal management rule" as defined in R.C. 111.15(A)(3), as it does not govern "the day-to-day staff procedures and operations within an agency." Executions are not day-to-day procedures or operations. They do not occur on a regular or frequent basis, nor are they routine.

2020-Ohio-506, 146 N.E.3d 605, at ¶ 19.

{¶ 43} The inmates argue that the court of appeals was wrong to hold that an internal-management rule must govern operations that occur daily.[2] According to the inmates, the "only requirement is that the Agency intend[s] to apply the standard uniformly in those circumstances where the standard applies at all."

{¶ 44} However, this argument incorrectly conflates rules "having a general and uniform operation" with internal-management rules. Under R.C. 111.15(A), these are two distinct categories and both must comply with the statute to take effect. Thus, whether a directive is to be applied uniformly is irrelevant to whether it is an internal-management rule; to qualify as an internal-management rule, the directive must satisfy the definition contained in R.C. 111.15(A)(3).

{¶ 45} The inmates cite *Assn. of MRDD Bds.*, 61 Ohio Misc.2d 836, 585 N.E.2d 597, and *B&T Express*, 145 Ohio App.3d 656, 763 N.E.2d 1241, in support of their argument that the protocol is an internal-management rule. But neither case supports their argument, because neither case addressed whether the administrative edict before the court fits the statutory definition of an internal-management rule. Instead, as we discuss above, both cases held that the edicts in question had a

---

2. The inmates misstate the Tenth District's conclusion here, as it did not limit internal-management rules to procedures and operations that occur "daily," but those that are "regular," "frequent," and "routine." 2020-Ohio-506, 146 N.E.3d 605, at ¶ 19.

general and uniform operation. *See Assn. of MRDD Bds*. at 842-843; *B&T Express* at 665.

{¶ 46} The court of appeals had it right. "Day-to-day" is defined as "a day at a time in unbroken succession; daily." *Webster's Third New International Dictionary* 578 (1993).[3] *See also Hall v. Progress Pig, Inc*., 259 Neb. 407, 414, 610 N.W.2d 420 (2000), quoting *Webster's Encyclopedic Unabridged Dictionary of the English Language* 370 (1989) (" '[d]ay-to-day' " means " 'occurring each day; daily' "); *Random House Dictionary of the English Language* 510 (2d Ed.1987).

{¶ 47} As used in R.C. 111.15(A)(3), "day-to-day" is perhaps best understood as not literally meaning *daily* operations and procedures. However, the court of appeals' reading of "day-to-day" as "frequent" or "routine," 2020-Ohio-506, 146 N.E.3d 605, at ¶ 19, preserves the core of the phrase's meaning. And other courts have similarly construed "day-to-day." *See Hall* at 414 ("day-to-day labor and management" of a farm or ranch means "those activities that occur as a routine part of the farm or ranch operation"); *Enix v. Burrell*, 572 F.Supp. 1364, 1369-1370 (S.D.Ohio 1983) ("day-to-day management" of a pension plan includes "ordinary administration" but not "extraordinary" matters). Indeed, the inmates' argument simply misconstrues the statutory language of R.C. 111.15.

{¶ 48} And as the court of appeals said, executions are not routine occurrences. Since 1999, Ohio has carried out or attempted to carry out 58 death sentences. *See* Ohio Attorney General, 2020 Capital Crimes Report, at 34 (identifying 56 executions), https://www.ohioattorneygeneral.gov/2020CapitalCrimesReport (accessed Aug. 12, 2021) [https://perma.cc/7CXT-ECK7]; *Broom v. Shoop*, 963 F.3d 500, 504-506, 513 (6th Cir.2020) (discussing

---

3. "Day-to-day" may also mean "a day at a time without provision for continuance thereafter," as in "life * * * lived on an aimless, day-to-day basis." *Webster's Encyclopedic Dictionary of the English Language* 370 (1989). But it is hard to see how that definition could apply to "staff procedures and operations within an agency," R.C. 111.15(A)(3).

the two unsuccessful attempts). An operation or procedure that is performed on average fewer than three times a year is hardly a "day-to-day" occurrence under any definition. It follows that the execution protocol in 01-COM-11 is not an "internal-management rule" as defined in R.C. 111.15(A)(3).

*C. Is the protocol an "order respecting the duties of employees"?*

{¶ 49} Finally, if the execution protocol is an "order respecting the duties of employees," R.C. 111.15(A)(1), then it is not a "rule." The court of appeals held that the protocol is an order respecting the duties of employees. As that court explained:

> 01-COM-11 is an "order respecting the duties of employees" because it establishes the methods, processes, and procedures to be employed by ODRC personnel in carrying out the execution of a condemned inmate. 01-COM-11 is a 21-page document setting forth detailed instructions, procedures, and guidelines to be followed by "all individuals involved in carrying out a court-ordered death sentence." (01-COM-11, Section III.) It stands to reason that ODRC employees are the "individuals involved in carrying out a court-ordered death sentence." The policy sets forth numerous procedures to be accomplished by ODRC personnel 30 days, 14 days, 24 hours, and 15 minutes prior to a scheduled execution, as well as procedures to be employed post-execution. The policy also includes extensive instructions directing employees in the procurement, preparation, and administration of the drugs to be utilized in the execution process.

2020-Ohio-506, 146 N.E.3d 605, at ¶ 21.

{¶ 50} This analysis is correct. It is true, as the inmates argue, that certain provisions of the protocol affect people who are not DRC employees—most obviously, the inmate being executed, but also the inmate's family, clergy, counsel, and the news-media personnel covering the execution. Nevertheless, as we discussed above, the protocol amounts to an instruction manual on how to perform an execution. As one would expect of such a manual, nearly all of it deals with the duties of DRC personnel participating in an execution.

*D. Is the protocol a "rule" because it was adopted under the authority of R.C. 5120.01?*

{¶ 51} R.C. 5120.01 provides, in part:

> The director of rehabilitation and correction is the executive head of the department of rehabilitation and correction. All duties conferred on the various divisions and institutions of the department by law or by order of the director shall be performed under the rules and regulations that the director prescribes and shall be under the director's control.

{¶ 52} The inmates point to the provision of R.C. 5120.01 that requires DRC to carry out all its duties "under the rules and regulations that the director prescribes" to argue that this language requires *whatever* DRC does to fulfill its duties to be done under a "rule or regulation." And their argument implicitly assumes, without attempting to demonstrate, that "rules and regulations" as used in R.C. 5120.01 means only those rules that have been adopted in accordance with the rule-filing procedures of R.C. 111.15.

{¶ 53} The inmates further note that while R.C. 5120.01 applies specifically to DRC, R.C. 111.15 applies generally to state agencies that are not subject to the Administrative Procedure Act. Citing the principle that "specific statutory

provisions prevail over conflicting general statutes," *State v. Chippendale*, 52 Ohio St.3d 118, 120, 556 N.E.2d 1134 (1990), they contend that R.C. 5120.01 prevails over the provision of R.C. 111.15(A) that "orders regarding the duties of employees" are not "rules" and are therefore not subject to the filing requirement of R.C. 111.15(B).

{¶ 54} Generally, when there is a conflict between a general statutory provision and a more specific statutory provision, the specific provision controls. *MacDonald v. Cleveland Income Tax Bd. of Rev.*, 151 Ohio St.3d 114, 2017-Ohio-7798, 86 N.E.3d 314, ¶ 27, citing Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 183 (2012). But when two statutes are capable of coexisting, it is the duty of the courts to regard each as effective and, when possible, to interpret them in a way that gives effect to both. *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). Thus, if we can, we must construe R.C. 5120.01 so that it does *not* conflict with R.C. 111.15(A). If the conflict between the two statutes is irreconcilable, then may we decide that one prevails over the other. *See State v. Pribble*, 158 Ohio St.3d 490, 2019-Ohio-4808, 145 N.E.3d 259, ¶ 13.

{¶ 55} R.C. 5120.01 conflicts with R.C. 111.15(A) only if we adopt the inmates' proposed reading of R.C. 5120.01, i.e., that the director of DRC must formally promulgate an administrative rule to govern *every* duty carried out by DRC personnel. As the state points out, that covers a lot of territory—from deciding the direction in which the lunch line should move to dealing with an inmate's unforeseen medical emergency. And the inmates cite no language in R.C. 5120.01 or elsewhere that indicates that the term "rules and regulations" in that statute refers only to "rules adopted through the rule-filing procedures of R.C. 111.15." Thus, the two statutes are reconcilable and we thus reject the argument that R.C. 5120.01 requires that all of DRC's duties be carried out pursuant to formally promulgated rules.

*E. The inmates' other arguments*

**{¶ 56}** The inmates' remaining arguments take us away from the controlling statutes and may be disposed of quickly.

**{¶ 57}** The inmates argue that when an administrative agency engages in filling in legislative "gaps," it must do so by adopting rules. Thus, they contend that 01-COM-11 was required to be rule-filed because it specifies details that are not prescribed by legislation. They cite no statute to support this argument, and instead quote the following language from *N.W. Ohio Bldg. & Constr. Trades Council v. Conrad*, 92 Ohio St.3d 282, 289, 750 N.E.2d 130 (2001), quoting *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974): "As the United States Supreme Court has noted, '[t]he power of an administrative agency to administer a * * * program *necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly,*' by the legislature." (Brackets, ellipsis, and emphasis added in *N.W. Ohio Bldg. & Constr. Trades*.)

**{¶ 58}** But this unremarkable general observation does not mean that all legislative gaps must be filled by formal rulemaking. That question was not before us in *N.W. Ohio Bldg. & Constr. Trades*, because the rules challenged in that case were formally promulgated as provisions of the Administrative Code. *Id*. at 285-292.

**{¶ 59}** Indeed, the great majority of directives that agencies issue, whether formally promulgated or not, fill in legislative gaps by solving matters that have not been specified by statutes. Accordingly, this argument does not help to distinguish between administrative edicts that must be rule-filed under R.C. 111.15(A) and those that need not be.

**{¶ 60}** The inmates also argue that the protocol should have been promulgated under R.C. 111.15 because the drafting, filing, and reviewing requirements of R.C. 111.15 are essential to prevent agencies from crossing "the

line between legislation and rulemaking." However, this policy argument is quite untethered from the language of R.C. 111.15.

{¶ 61} Finally, the inmates note that outside the death-penalty context, DRC has promulgated administrative rules dealing with some of the matters that are also covered by 01-COM-11, such as attorney-client access and the transfer of prisoners between institutions. From this, they infer that DRC has "recognized that these matters are subject to the rulemaking requirements of R.C. 111.15." But of course, the fact that DRC has used formal rulemaking in the past to address certain subjects in no way amounts to an admission that it *must* do so when it addresses those same subjects in the future.

## IV. Conclusion

{¶ 62} We hold that the inmates have standing to challenge the validity of the execution protocol described in 01-COM-11. We reject the inmates' arguments, however, on their merits. We hold that 01-COM-11 is neither a rule having a general and uniform application nor an internal-management rule and that it is an order dealing with the duties of DRC's employees. Therefore, DRC was not required to file 01-COM-11 pursuant to R.C. 111.15. We affirm the judgment of the court of appeals.[4]

Judgment affirmed.

O'CONNOR, C.J., and KENNEDY, DEWINE, DONNELLY, STEWART, and BRUNNER, JJ., concur.

—————————

Dave Yost, Attorney General, Benjamin M. Flowers, Solicitor General, Michael J. Hendershot, Chief Deputy Solicitor General, Charles A. Schneider,

—————————

4. Counsel for O'Neal has called this court's attention to an inadvertent misstatement that counsel had made during oral argument. We note the correction, and we further note that the misstatement in no way affects our disposition of this case.

Criminal Justice Section Chief, and Brenda S. Leikala, Senior Assistant Attorney General, for appellees.

Timothy Young, Ohio Public Defender, and Richard A. Cline and Randall Porter, Assistant State Public Defenders; Dale A. Baich, Assistant Federal Public Defender; and Porter, Wright, Morris & Arthur, L.L.P., and L. Bradfield Hughes, for appellant Cleveland Jackson in case No. 2020-0676.

S. Adele Shank and Lawrence J. Greger, for appellant James D. O'Neal in case No. 2020-0683.

_____